Martin J. Brill (Calif. Bar No. 53220)
Krikor J. Meshefejian (Calif. Bar No. 255030)
**LEVENE, NEALE, BENDER, YOO & BRILL, L.L.P.**
10250 Constellation Blvd., Suite 1700
Los Angeles, California 90067
Telephone:     (310) 229-1234
Facsimile:      (310) 229-1244
mjb@lnbyb.com
*Counsel for Defendants and Counterclaimants Caldera Mineral Resources, LLC and Caldera Holdings, LLC*
*Pro Hac Vice Application Approved*

Christopher A. Grivakes (Calif. Bar No. 127994)
**AFFELD GRIVAKES ZUCKER LLP**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone:     (310) 979-8700
Facsimile:      (310) 979-8701
cg@agzlaw.com
*Counsel for Defendants and Counterclaimants Caldera Mineral Resources, LLC and Caldera Holdings, LLC*
*Pro Hac Vice Application Approved*

M. Darin Hammond – Bar No. 6741
**SMITH KNOWLES, P.C.**
2225 Washington Blvd., Suite 200
Ogden, UT  84401
Telephone:     (801) 476-0303
Facsimile:      (801) 476-0399
dhammond@smithknowles.com
*Local Counsel for Defendants and Counterclaimants Caldera Mineral Resources, LLC and Caldera Holdings, LLC*

---

## IN THE UNITED STATES BANKRUPTCY COURT

| In re:<br><br>**FEDERAL RESOURCES CORPORATION** and **CAMP BIRD COLORADO, INC.**<br><br>Debtors. | Jointly Administered Under<br>Bankruptcy Case No. 14-33427<br><br>Chapter 11<br>Judge Kevin R. Anderson<br><br>**THIS DOCUMENTS RELATES TO:** |
|---|---|

|  | **X** Both cases |
|---|---|
| **CAMP BIRD COLORADO, INC.**, a Colorado corporation; and **CAMP BIRD TUNNELL, MINING AND TRANSPORTATION COMPANY**, a Colorado corporation,<br><br>    Plaintiffs,<br><br>v.<br><br>**CALDERA MINERAL RESOURCES, LLC**, a Delaware limited liability company, and **CALDERA HOLDINGS, LLC**, a Delaware limited liability company,<br><br>    Defendants. | Adversary Proceeding No.: 1502221 |
| **CALDERA MINERAL RESOURCES, LLC**, a Delaware limited liability company, and **CALDERA HOLDINGS, LLC**, a Delaware limited liability company,<br><br>    Counter-claimants and cross-complainants,<br><br>v.<br><br>**CAMP BIRD COLORADO, INC.**, a Colorado corporation; and **CAMP BIRD TUNNELL, MINING AND TRANSPORTATION COMPANY**, a Colorado corporation, **UNITED STATES OF AMERICA**,<br><br>    Counter-defendants and cross-defendants. | |

<div align="center">

**DEFENDANTS' ANSWER TO COMPLAINT, COUNTERCLAIM**

**AND CROSS-COMPLAINT**

</div>

## ANSWER TO FIRST AMENDED COMPLAINT

Defendants Caldera Mineral Resources, LLC ("**Caldera**") and Caldera Holdings, LLC ("**Holdings**") (collectively, "**Defendants**") hereby answer the First Amended Complaint ("**Complaint**") filed by Plaintiffs Camp Bird Colorado, Inc. ("**Camp Bird**") and Camp Bird Tunnel, Mining and Transportation Company ("**CBTMT**") (collectively, "**Plaintiffs**") by admitting, denying and alleging as follows. All allegations not unequivocally admitted are denied.

## FIRST DEFENSE

### (Response to Allegations in First Amended Complaint)

1. Defendants admit the allegations in ¶ 1 of the Complaint.

2. Defendants admit the allegations in ¶ 2 of the Complaint.

3. Defendants admit the allegations in ¶ 3 of the Complaint.

4. Defendants admit the allegations in ¶ 4 of the Complaint.

5. Defendants admit the allegations in ¶ 5 of the Complaint.

6. Defendants admit the allegations in ¶ 6 of the Complaint.

7. Defendants admit that the claims of Camp Bird are core proceedings under 28 U.S.C. §§ 157(b)(2)(B), (C) and (K), but deny the remainder of the allegations in ¶ 7 of the Complaint. Defendants do not consent to entry of final orders or judgment by the bankruptcy judge on any non-core proceeding. Defendants do not consent to entry of final orders or judgment by the bankruptcy judge on any core proceeding which bankruptcy judges lack the authority to issue final orders or judgment, including without limitation the second and fourth counts relating to the Stipulation, the sixth and seventh counts relating to

alleged misrepresentations, the tenth count relating to alter ego remedies, and the eighth count relating to the prior counts.

8.      Defendants admit the allegations in ¶ 8 of the Complaint.

9.      Defendants admit the allegations in ¶ 9 of the Complaint.

10.     Answering ¶ 10 of the Complaint, Defendants allege that Plaintiffs misrepresented to Defendants their "various water and tunnel rights used and associated with the Camp Bird Mine." Accordingly, it is for the Court to determine the scope of the "various water and tunnel rights used and associated with the Camp Bird Mine." Defendants lack knowledge or information sufficient to form a belief about whether Camp Bird is the sole owner of CBTMT. Defendants deny the remaining allegations of this paragraph.

11.     Answering ¶ 11 of the Complaint, Defendants admit that Camp Bird and Caldera entered into an Option Agreement. The Option Agreement attached as <u>Exhibit A</u> to the Complaint is incomplete as it is missing Exhibit D thereto. Defendants allege that the Option Agreement and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon. Defendants deny the remaining allegations of this paragraph.

12.     Answering ¶ 12 of the Complaint, Defendants admit that Camp Bird and Caldera entered into the Memorandum attached as <u>Exhibit B</u> to the Complaint. Defendants allege that the Memorandum and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal

effect of each together with the rights and responsibilities of the parties based thereon. Defendants deny the remaining allegations of this paragraph.

13.     Answering ¶ 13 of the Complaint, Defendants admit that Camp Bird and Caldera entered into the Guarantee Agreement attached as <u>Exhibit C</u> to the Complaint. Defendants allege that Plaintiffs' selective quoting from the Guarantee Agreement such that ¶ 13 is out of context, incomplete, misleading, misinterpreted and/or misconstrued. Defendants allege that the Guarantee Agreement and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon.  Defendants deny the remaining allegations of this paragraph.

14.     Answering ¶ 14 of the Complaint, Defendants admit that Plaintiffs granted a security interest to Holdings.  Defendants allege that Plaintiffs' selective reference to the scope of the security interest granted in the Deed of Trust in ¶ 14 is incomplete, misleading, misinterpreted and/or misconstrued.  Defendants allege that the security interest granted to Holdings is set forth in various documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon.  Defendants deny the remaining allegations of this paragraph.

15.     Answering ¶ 15 of the Complaint, Defendants admit that Camp Bird and Caldera executed the Deed of Trust attached as <u>Exhibit D</u> to the Complaint. Defendants allege that Plaintiffs' selective reference to the scope of the security interest granted in the Deed of Trust in ¶ 15 is incomplete, misleading, misinterpreted and/or misconstrued.

Defendants allege that the Deed of Trust and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon. Defendants deny the remaining allegations of this paragraph.

16.     Answering ¶ 16 of the Complaint, Defendants admit that Camp Bird entered into the Tailings Letter attached as <u>Exhibit E</u> to the Complaint. Defendants allege that Plaintiffs' selective quoting from the Tailings Letter renders ¶ 16 incomplete, misleading, misinterpreted and/or misconstrued.   Defendants allege that the Tailings Letter and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon.  Defendants deny the remaining allegations of this paragraph.

17.     Answering ¶ 17 of the Complaint, Defendants admit that Camp Bird executed the Royalty Reservation attached as <u>Exhibit F</u> to the Complaint. Defendants allege that Plaintiffs' selective quoting from the Royalty Reservation renders ¶ 17 incomplete, misleading, misinterpreted and/or misconstrued.   Defendants allege that the Royalty Reservation and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon.  Defendants deny the remaining allegations of this paragraph.

18.     Answering ¶ 18 of the Complaint, Defendants admit that CBTMT and Camp Bird executed the Water License attached as <u>Exhibit G</u> to the Complaint. Defendants allege

that Plaintiffs' selective quoting from the Water License renders ¶ 18 incomplete, misleading, misinterpreted and/or misconstrued. Defendants allege that the Water License and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon. Defendants deny the remaining allegations of this paragraph.

19.     Answering ¶ 19 of the Complaint, Defendants admit that Holdings filed the UCC-1 Financing Statement attached as <u>Exhibit H</u> to the Complaint.

20.     Answering ¶ 20 of the Complaint, Defendants admit that Holdings filed the UCC-1 Financing Statement attached as <u>Exhibit I</u> to the Complaint.

21.     Defendants admit that Plaintiffs collectively refer in the Complaint to the various agreements referenced in ¶ 21 of the Complaint as the "Caldera Agreements".

22.     Defendants admit the allegations in ¶ 22 of the Complaint.

23.     Defendants admit the allegations in ¶ 23 of the Complaint.

24.     Defendants admit the allegations in ¶ 24 of the Complaint.

25.     Answering ¶ 25 of the Complaint, Defendants admit that a true and correct copy of an unsigned version of the JV Agreement is attached as <u>Exhibit J</u> to the Complaint. Defendants allege that the JV Agreement and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon if the agreement were ever executed. Defendants deny the remaining allegations of this paragraph.

26.     Answering ¶ 26 of the Complaint, Defendants allege that Plaintiffs' selective quoting from the JV Agreement renders ¶ 26 incomplete, misleading, misinterpreted and/or misconstrued. Defendants allege that the JV Agreement and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon if the agreement were ever executed. Defendants deny the remaining allegations of this paragraph.

27.     Answering ¶ 27 of the Complaint, Defendants allege that Plaintiffs' selective quoting from the JV Agreement renders ¶ 27 incomplete, misleading, misinterpreted and/or misconstrued. Defendants allege that the JV Agreement and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon if the agreement were ever executed. Defendants deny the remaining allegations of this paragraph.

28.     Answering ¶ 28 of the Complaint, Defendants allege that Plaintiffs' selective quoting from the JV Agreement renders ¶ 28 incomplete, misleading, misinterpreted and/or misconstrued. Defendants allege that the JV Agreement and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon if the agreement were ever executed. Defendants deny the remaining allegations of this paragraph.

29.     Answering ¶ 29 of the Complaint, Defendants allege that Plaintiffs'

selective quoting from the JV Agreement renders ¶ 29 incomplete, misleading, misinterpreted and/or misconstrued. Defendants allege that the JV Agreement and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon if the agreement were ever executed. Defendants deny the remaining allegations of this paragraph.

30.     Answering ¶ 30 of the Complaint, Defendants allege that Plaintiffs' selective quoting, and misquoting from the Option Agreement, renders ¶ 30 incomplete, misleading, misinterpreted and/or misconstrued. Defendants allege that the Option Agreement and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon.  Defendants deny the remaining allegations of this paragraph.

31.     Answering ¶ 31 of the Complaint, Defendants allege that Plaintiffs' selective quoting from the Option Agreement renders ¶ 31 incomplete, misleading, misinterpreted and/or misconstrued. Defendants allege that the Option Agreement and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon.  Defendants deny the remaining allegations of this paragraph..

32.     Answering ¶ 32 of the Complaint, Defendants allege that Plaintiffs' selective quoting from the Option Agreement renders ¶ 32 incomplete, misleading,

misinterpreted and/or misconstrued. Defendants allege that the Option Agreement and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon. Defendants deny the remaining allegations of this paragraph.

33. Answering ¶ 33 of the Complaint, Defendants allege that Plaintiffs' selective quoting from the Option Agreement renders ¶ 33 incomplete, misleading, misinterpreted and/or misconstrued. Defendants allege that the Option Agreement and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon. Defendants deny the remaining allegations of this paragraph.

34. Answering ¶ 34 of the Complaint, Defendants allege that Plaintiffs' selective quoting from the Option Agreement renders ¶ 34 incomplete, misleading, misinterpreted and/or misconstrued. Defendants allege that the Option Agreement and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon. Defendants deny the remaining allegations of this paragraph.

35. Defendants admit that it delivered to Camp Bird a writing giving a *conditional* notice of its election to exercise an option to purchase 60% of the Mining Claims as defined in the Option Agreement. Defendants allege that Plaintiffs made

material misrepresentations to Defendants in order to fraudulently induce them to deliver the writing.  Defendants deny the remaining allegations of this paragraph

36.     Defendants deny the allegations in ¶ 36 of the Complaint.

37.     Defendants admit the allegations in ¶ 37 of the Complaint.

38.     Defendants admit the allegations in ¶ 38 of the Complaint.

39.     Answering ¶ 39 of the Complaint, Defendants allege that Plaintiffs' selective quoting from the Writ of Sequestration renders ¶ 39 incomplete, misleading, misinterpreted and/or misconstrued. Defendants allege that the Writ of Sequestration and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon.  Defendants deny the remaining allegations of this paragraph.

40.     Answering ¶ 40 of the Complaint, Defendants admit that Caldera's lawyers signed the Stipulation attached as <u>Exhibit K</u> to the Complaint. Defendants allege that Plaintiffs made material misrepresentations to induce Defendants' lawyers to sign the Stipulation such that it is not enforceable.  Defendants allege that the Stipulation and related documents speak for themselves.  It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon.  Defendants deny the remaining allegations this paragraph.

41.     Answering ¶ 41 of the Complaint, Defendants admit that Caldera's lawyers signed the Stipulation attached as <u>Exhibit K</u> to the Complaint. Defendants allege that

Plaintiffs made material misrepresentations to induce Defendants' lawyers to sign the Stipulation such that it is not enforceable. Defendants allege that the Stipulation and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon. Defendants deny the remaining allegations this paragraph.

42.     Answering ¶ 42 of the Complaint, Defendants admit that Caldera's lawyers signed the Stipulation attached as <u>Exhibit K</u> to the Complaint. Defendants allege that Plaintiffs made material misrepresentations to induce Defendants' lawyers to sign the Stipulation such that it is not enforceable. Defendants allege that the Stipulation and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon. Defendants deny the remaining allegations this paragraph.

43.     Answering ¶ 43 of the Complaint, Defendants admit that Caldera's lawyers signed the Stipulation attached as <u>Exhibit K</u> to the Complaint. Defendants allege that Plaintiffs made material misrepresentations to induce Defendants' lawyers to sign the Stipulation such that it is not enforceable. Defendants allege that the Stipulation and related documents speak for themselves. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon. Defendants deny the remaining allegations this paragraph.

44.     Answering ¶ 44 of the Complaint, Defendants admit that Caldera's lawyers signed the Stipulation attached as <u>Exhibit K</u> to the Complaint. Defendants allege that Plaintiffs made material misrepresentations to induce Defendants' lawyers to sign the Stipulation such that it is not enforceable.   Defendants allege that the Stipulation and related documents speak for themselves.  It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon.  Defendants deny the remaining allegations this paragraph.

45.     Answering ¶ 45 of the Complaint, Defendants admit that Caldera's lawyers signed the Stipulation attached as <u>Exhibit K</u> to the Complaint. Defendants allege that Plaintiffs made material misrepresentations to induce Defendants' lawyers to sign the Stipulation such that it is not enforceable.   Defendants allege that the Stipulation and related documents speak for themselves.  It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon.  Defendants deny the remaining allegations this paragraph.

46.     Answering ¶ 46 of the Complaint, Defendants admit that Caldera's lawyers signed the Stipulation attached as <u>Exhibit K</u> to the Complaint. Defendants allege that Plaintiffs made material misrepresentations to induce Defendants' lawyers to sign the Stipulation such that it is not enforceable.   Defendants allege that the Stipulation and related documents speak for themselves.  It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and

responsibilities of the parties based thereon. Defendants deny the remaining allegations this paragraph.

47.     Answering ¶ 47 of the Complaint, Defendants admit that Camp Bird signed the Idaho Guarantee. Defendants deny the remaining allegations of ¶ 47 of the Complaint.

48.     Defendants admit the allegations of ¶ 48 of the Complaint. Defendants allege that Plaintiffs made material misrepresentations to induce Defendants' lawyers to sign the Stipulation such that it is not enforceable.

49.     Defendants deny the allegations of ¶ 49 of the Complaint. Defendants allege that Plaintiffs made material misrepresentations to induce Defendants' lawyers to sign the Stipulation such that it is not enforceable.

50.     Defendants deny the allegations of ¶ 50 of the Complaint.

51.     Defendants deny the allegations of ¶ 51 of the Complaint. Defendants allege that Plaintiffs made material misrepresentations to fraudulently induce Defendants' and their lawyers to deliver the conditional Option Notice and to sign the Stipulation such that they are not enforceable.

52.     Defendants deny the allegations of ¶ 52 of the Complaint. Defendants allege that Plaintiffs made material misrepresentations to fraudulently induce Defendants' and their lawyers to deliver the conditional Option Notice and to sign the Stipulation such that they are not enforceable.

53.     Answering ¶ 53 of the Complaint, Defendants admit that Camp Bird gave the Notice of Default attached as <u>Exhibit M</u> to the Complaint. Defendants deny the remaining allegations this paragraph.

54.     Defendants deny the allegations of ¶ 54 of the Complaint.  Defendants allege that Plaintiffs made material misrepresentations to fraudulently induce Defendants' and their lawyers to deliver the conditional Option Notice and to sign the Stipulation such that they are not enforceable.

55.     Defendants deny the allegations of ¶ 55 of the Complaint.  Defendants allege that Plaintiffs made material misrepresentations to fraudulently induce Defendants' and their lawyers to deliver the conditional Option Notice and to sign the Stipulation such that they are not enforceable.

56.     Defendants deny the allegations of ¶ 56 of the Complaint.

57.     Defendants deny the allegations of ¶ 57 of the Complaint.

58.     Defendants deny the allegations of ¶ 58 of the Complaint.

59.     Defendants deny the allegations of ¶ 59 of the Complaint.

60.     Defendants deny the allegations of ¶ 60 of the Complaint.

61.     Defendants deny the allegations of ¶ 61 of the Complaint.

62.     Defendants admit the allegations of ¶ 62 of the Complaint.

63.     Defendants deny the allegations of ¶ 63 of the Complaint.

64.     Defendants deny the allegations of ¶ 64 of the Complaint.

65.     Defendants deny the allegations of ¶ 65 of the Complaint.

66.     Answering ¶ 66 of the Complaint, Defendants incorporate by reference all prior responses.

67.     Defendants admit the allegations in paragraph 67 of the Complaint, except that Defendants deny that the JV Agreement is a contract.

68.	Defendants deny the allegations in paragraph 68 of the Complaint.

69.	Defendants deny the allegations in paragraph 69 of the Complaint.

70.	Defendants deny the allegations in paragraph 70 of the Complaint.

71.	Defendants deny the allegations in paragraph 71 of the Complaint.

72.	Defendants deny the allegations in paragraph 72 of the Complaint.

73.	Answering ¶ 73 of the Complaint, Defendants incorporate by reference all prior responses.

74.	Defendants deny the allegations in paragraph 74 of the Complaint.

75.	Defendants deny the allegations in paragraph 75 of the Complaint.

76.	Defendants deny the allegations in paragraph 76 of the Complaint.

77.	Defendants deny the allegations in paragraph 77 of the Complaint.

78.	Defendants deny the allegations in paragraph 78 of the Complaint.

79.	Defendants deny the allegations in paragraph 79 of the Complaint.

80.	Defendants deny the allegations in paragraph 80 of the Complaint.

81.	Defendants deny the allegations in paragraph 81 of the Complaint.

82.	Answering ¶ 82 of the Complaint, Defendants incorporate by reference all prior responses.

83.	Defendants admit the allegations in paragraph 83 of the Complaint, except that Defendants deny that the JV Agreement is a contract.

84.	Defendants deny the allegations in paragraph 84 of the Complaint.

85.	Defendants deny the allegations in paragraph 85 of the Complaint.

86.	Defendants allege that Plaintiffs made material misrepresentations to

Defendants in order to fraudulently induce them to deliver the conditional Option Notice. Defendants deny the remaining allegations of this paragraph.

87.     Defendants deny the allegations in paragraph 87 of the Complaint.

88.     Defendants deny the allegations in paragraph 88 of the Complaint.

89.     Defendants deny the allegations in paragraph 89 of the Complaint.

90.     Defendants deny the allegations in paragraph 90 of the Complaint.

91.     Defendants deny the allegations in paragraph 91 of the Complaint.

92.     Defendants deny the allegations in paragraph 92 of the Complaint.

93.     Answering ¶ 93 of the Complaint, Defendants incorporate by reference all prior responses.

94.     Defendants deny the allegations in paragraph 94 of the Complaint.

95.     Defendants deny the allegations in paragraph 95 of the Complaint.

96.     Defendants allege that Plaintiffs made material misrepresentations to fraudulently induce Defendants' and their lawyers to sign the Stipulation such that it is not enforceable against Defendants. Defendants admit the remaining allegations of this paragraph.

97.     Defendants deny the allegations in paragraph 97 of the Complaint.

98.     Defendants deny the allegations in paragraph 98 of the Complaint.

99.     Defendants deny the allegations in paragraph 99 of the Complaint.

100.    Defendants deny the allegations in paragraph 100 of the Complaint.

101.    Defendants deny the allegations in paragraph 101 of the Complaint.

102.    Defendants deny the allegations in paragraph 102 of the Complaint.

103. Defendants deny the allegations in paragraph 103 of the Complaint.

104. Defendants deny the allegations in paragraph 104 of the Complaint.

105. Answering ¶ 105 of the Complaint, Defendants incorporate by reference all prior responses.

106. Defendants deny the allegations in paragraph 106 of the Complaint.

107. Defendants deny the allegations in paragraph 107 of the Complaint.

108. Defendants deny the allegations in paragraph 108 of the Complaint.

109. Defendants deny the allegations in paragraph 109 of the Complaint.

110. Defendants deny the allegations in paragraph 110 of the Complaint.

111. Defendants deny the allegations in paragraph 111 of the Complaint.

112. Defendants deny the allegations in paragraph 112 of the Complaint.

113. Defendants deny the allegations in paragraph 113 of the Complaint.

114. Defendants deny the allegations in paragraph 114 of the Complaint.

115. Defendants deny the allegations in paragraph 115 of the Complaint.

116. Answering ¶ 116 of the Complaint, Defendants incorporate by reference all prior responses.

117. Defendants deny the allegations in paragraph 117 of the Complaint.

118. Defendants deny the allegations in paragraph 118 of the Complaint.

119. Defendants deny the allegations in paragraph 119 of the Complaint.

120. Defendants deny the allegations in paragraph 120 of the Complaint.

121. Defendants deny the allegations in paragraph 121 of the Complaint.

122. Defendants deny the allegations in paragraph 122 of the Complaint.

123.     Defendants deny the allegations in paragraph 123 of the Complaint.

124.     Defendants deny the allegations in paragraph 124 of the Complaint.

125.     Defendants deny the allegations in paragraph 125 of the Complaint.

126.     Answering ¶ 126 of the Complaint, Defendants incorporate by reference all prior responses.

127.     Defendants admit the allegations in paragraph 127 of the Complaint.

128.     Defendants admit the allegations in paragraph 128 of the Complaint.

129.     Defendants admit the allegations in paragraph 129 of the Complaint.

130.     Defendants deny the allegations in paragraph 130 of the Complaint.

131.     Defendants deny the allegations in paragraph 131 of the Complaint.

132.     Answering ¶ 132 of the Complaint, Defendants incorporate by reference all prior responses.

133.     Defendants admit the allegations in paragraph 133 of the Complaint.

134.     Defendants admit the allegations in paragraph 134 of the Complaint.

135.     Defendants admit the allegations in paragraph 135 of the Complaint.

136.     Defendants admit the allegations in paragraph 136 of the Complaint.

137.     Defendants admit the allegations in paragraph 137 of the Complaint.

138.     Defendants admit the allegations in paragraph 138 of the Complaint.

139.     Defendants admit the allegations in paragraph 139 of the Complaint.

140.     Defendants deny the allegations in paragraph 140 of the Complaint.

141.     Defendants deny the allegations in paragraph 141 of the Complaint.

142.     Defendants deny the allegations in paragraph 142 of the Complaint.

143.     Defendants deny the allegations in paragraph 143 of the Complaint.

144.     Defendants deny the allegations in paragraph 144 of the Complaint. Defendants allege that the reference in ¶15 of the Option Agreement to machinery or equipment "installed" at the site refers only to fixtures and not to other personal property. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon.

145.     Defendants deny the allegations in paragraph 144 of the Complaint. Defendants allege that the reference in ¶15 of the Option Agreement to machinery or equipment "installed" at the site refers only to fixtures and not to other personal property. It is for the Court to interpret each material term and provision to determine the meaning and legal effect of each together with the rights and responsibilities of the parties based thereon.

146.     Answering ¶ 146 of the Complaint, Defendants incorporate by reference all prior responses.

147.     Defendants deny the allegations in paragraph 147 of the Complaint.

148.     Defendants deny the allegations in paragraph 148 of the Complaint.

149.     Defendants deny the allegations in paragraph 149 of the Complaint.

150.     Answering ¶ 150 of the Complaint, Defendants incorporate by reference all prior responses.

151.     Defendants deny the allegations in paragraph 151 of the Complaint.

152.     Defendants admit the allegations in paragraph 152 of the Complaint.

153. Defendants deny the allegations in paragraph 153 of the Complaint.

154. Defendants deny the allegations in paragraph 154 of the Complaint.

155. Defendants deny the allegations in paragraph 155 of the Complaint.

156. Defendants deny the allegations in paragraph 156 of the Complaint.

157. Defendants deny the allegations in paragraph 157 of the Complaint.

158. Defendants deny the allegations in paragraph 158 of the Complaint.

159. Defendants deny the allegations in paragraph 159 of the Complaint.

160. Defendants deny the allegations in paragraph 160 of the Complaint.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

161. As a separate and affirmative defense, Defendants allege that Plaintiffs' Complaint fails to state a claim for relief upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

### (Fraud)

162. As a separate and affirmative defense, Defendants allege that Plaintiffs' claims are barred by the following material misrepresentations and/or omissions by Plaintiffs in the "Mining Lease and Option to Purchase" and related documents which Defendants discovered after delivering the Option Notice and signing the Stipulation: (i) misrepresentations regarding Level 3 access to the mine; (ii) misrepresentations regarding Level 1 access to the mine; (iii) misrepresentations regarding ownership of the tailings pond within the permitted area which is approximately 50% owned by a third party; and (iv) misrepresentations regarding the time and cost to rehabilitate the property and value of

the mine.

## THIRD AFFIRMATIVE DEFENSE

### (Breach of Contract)

As a separate and affirmative defense, Defendants allege that Plaintiffs' claims are barred because Plaintiffs breached the Mining Lease regarding Level 3 access to the mine, Level 1 access to the mine, ownership of the tailing pond, and the time and cost to rehabilitate the property and value of the mine.

## FOURTH AFFIRMATIVE DEFENSE

### (Mistake)

As a separate and affirmative defense, Defendants allege that Plaintiffs' claims are barred because of a mutual mistake or unilateral mistake regarding Level 3 access to the mine, Level 1 access to the mine, ownership of the tailing pond, and the time and cost to rehabilitate the property and value of the mine.

## FIFTH AFFIRMATIVE DEFENSE

### (Impossibility, Impracticability, Frustration of purpose)

As a separate and affirmative defense, Defendants allege that Plaintiffs' claims are barred because Defendants' performance was excused due to impossibility, impracticability, or frustration of purpose arising out of the lack of Level 3 access to the mine, lack of Level 1 access to the mine, ownership of the tailings pond, and the time and cost to re-habilitate the property and value of the mine.

## SIXTH AFFIRMATIVE DEFENSE

### (Duress or Economic Coercion)

As a separate and affirmative defense, Defendants allege that Plaintiffs' claims are barred because Defendants were subject to duress or economic coercion arising out of (i) Plaintiffs' misrepresentations and failure to disclose the CERCLA lawsuit filed by the EPA claiming, among other things, that Camp Bird was the subject of a fraudulent transfer action, and that Camp Bird was the alter ego for Federal Resources Corp. and Bentley Blum, and (ii) the resulting representation by the U.S. Department of Justice to Caldera's counsel that "If your client purchases the mine, or further encumbers it, the United States reserve the right to pursue all remedies available under the Federal Debt Collection Practices Act, or any other authorities, with regard to that property."

## SEVENTH AFFIRMATIVE DEFENSE

### (Unclean Hands, Estoppel, Waiver and/or Laches)

As separate and affirmative defenses, Defendants allege that Plaintiffs' claims are barred by the equitable doctrines of unclean hands, estoppel, waiver and/or laches. Plaintiffs' unclean hands arise out of (i) their failures to disclose the CERCLA lawsuit filed by the EPA claiming that the Camp Bird property was fraudulently transferred to Camp Bird and that Camp Bird was the alter ego for Federal Resources Corp. and Bentley Blum, and (ii) their misrepresentations regarding Level 3 access to the mine, Level 1 access to the mine, and the time and cost to rehabilitate the property and value of the mine. Such conduct also operates as an estoppel from asserting any claims against Defendants. In addition, Plaintiffs waived any claim of breach by Defendants by continuing to negotiate

with defendants over the Option price for a considerable period of time.

## EIGHTH AFFIRMATIVE DEFENSE

### (Failure of Condition Precedent)

As a separate and affirmative defense, Defendants allege that their exercise of the Option was conditioned "upon Camp Bird's compliance with all requirements and conditions of the Mining Lease", and that Plaintiffs failed to fulfill the requirements and conditions relating to delivery of Level 3 access to the mine, Level 1 access to the mine, and ownership of the tailings pond. Furthermore, Defendants allege that Plaintiffs' performance under the Mining Lease was a condition precedent to the enforceability of the Stipulation which provides that the "United States is entering into this Stipulation based on the existing terms and conditions of the Caldera Agreements" and that "Nothing herein affects in any way Caldera's rights against Camp Bird under the Agreements."

## NINTH AFFIRMATIVE DEFENSE

### (Lack of Consideration)

As a separate and affirmative defense, Defendants alleges that the Stipulation is not enforceable as against Defendants because Defendants received no new consideration for entering into the Stipulation.

## TENTH AFFIRMATIVE DEFENSE

### (No Damages)

As a separate and affirmative defense, Defendants alleges that that Plaintiffs' have not sustained any damages by virtue of Defendants' purported failure to perform under the Option and Stipulation because Plaintiffs sustained no damages as a result.

## ELEVENTH AFFIRMATIVE DEFENSE

### (General denial)

As a separate and affirmative defense, Defendants deny each and every allegation in the Complaint not specifically and unequivocally admitted.

## TWELFTH AFFIRMATIVE DEFENSE

### (Offset)

As a separate and affirmative defense, Defendants alleges that if liability exists, which Defendants deny, then Defendants are entitled to credit or offset for its claims against Plaintiff, including but not limited to those asserted in the Counterclaim herein.

## THIRTEETH AFFIRMATIVE DEFENSE

### (Lack of Subject Matter Jurisdiction)

As a separate and affirmative defense, Defendants allege that this Court lacks subject matter jurisdiction over the claims of Plaintiff CBTMT.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Other affirmative defenses)

As a separate and affirmative defense, Defendants allege that Plaintiffs' claims may be barred by various affirmative defenses, including but not limited to one or more of the following: substantial and or full performance by Defendants; prior breach by Plaintiffs; Plaintiffs may not be the real party in interest; unconscionability; parol evidence rule; election of remedies; failure to comply with conditions precedent; and/or by one or more other legal, equitable or other affirmative defenses. Defendants reserve the right to assert additional affirmative defenses as the bases for the same are revealed during discovery.

## PRAYER

WHEREFORE, Defendants pray for the following relief:

1.    That the First Amended Complaint be dismissed in its entirety with prejudice;

2.    That judgment be entered in favor of Defendants and against Plaintiffs on all claims for relief in the First Amended Complaint;

3.    For attorneys' fees if allowed by contract or applicable law;

4.    For costs of suit; and

5.    For such other and further relief that the Court deems appropriate.

## COUNTERCLAIM AGAINST CAMP BIRD COLORADO, INC. AND CAMP BIRD TUNNEL, MINING AND TRANSPORTATION COMPANY

## AND

## CROSS-COMPLAINT FOR DECLARATORY RELIEF AGAINST CAMP BIRD COLORADO, INC. AND CAMP BIRD TUNNEL, MINING AND TRANSPORTATION COMPANY AND THE UNITED STATES OF AMERICA

## THE PARTIES

1.    Counter-claimant Caldera Mineral Resources, LLC ("**Caldera**") is a Delaware limited liability company with its principal place of business in Los Angeles County, California.

2.    Counter-claimant Caldera Holdings, LLC ("**Holdings**") is a Delaware

limited liability company with its principal place of business in Los Angeles County, California.

3.      Caldera and Holdings are collectively referred to herein as **"Caldera Parties"**.

4.      Counter-defendant Camp Bird Colorado, Inc. (**"Camp Bird "**) is a Colorado corporation.

5.      Counter-defendant Camp Bird Tunnel, Mining and Transportation Company (**"CBTMT"**) is a Colorado corporation.

6.      Camp Bird and CBTMT are collectively referred to herein as **"Camp Bird Parties"**.

7.      Counter-defendant the United States of America (**"U.S."**) is a sovereign government.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 157(a) and 1334(b).

9.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1391(a)(1) and (2), and 1409, because this suit arises in and is related to the above-captioned bankruptcy case currently pending before this Court.

10.     This proceeding as against Camp Bird is a core proceeding pursuant to 28 U.S.C. § 157.  This proceeding as against CBTMT and the U.S. is a non-core proceeding. The Caldera Parties do not consent to entry of final orders or judgment by the bankruptcy judge on any non-core proceeding.  The Caldera Parties do not consent to entry of final

orders or judgment by the bankruptcy judge on any core proceeding which bankruptcy judges lack the authority to issue final orders or judgment.

<u>**GENERAL ALLEGATIONS**</u>

11.    <u>**The Mining Lease**</u>.  On or about September 20, 2012, Caldera entered into a "Mining Lease and Option to Purchase" with Camp Bird (the "<u>**Mining Lease**</u>"). A true and correct copy of the Mining Lease is attached hereto as <u>**Exhibit A**</u>.   Under the Mining Lease, Caldera acquired (i) an exclusive lease on mining claims for 10 years in exchange for a one-time advance royalty payment of $600,000, and (ii) the option to purchase 60% of the mining claims for $6,500,000 by March 19, 2013.

12.    In Section 2 of the Mining Lease, entitled "Representations and Warranties", Camp Bird made the following representations and warranties to Caldera, among others:

a.    Camp Bird owned the Mining Claims listed on Attachment A to the Mining Lease (¶ 2.a);

b.    The mining permits issued by the Colorado Division of Reclamation Mining & Safety ("<u>**DRMS**</u>") were in good standing and had not been violated (¶ 2.c);

c.    Camp Bird had the right to enter into the Mining Lease, and there were no third party claims (¶ 2.d. and f.);

d.    Camp Bird had approved and adopted the Phase 1 Plan (the "<u>**Plan**</u>") (¶ 2.i).

13.    Camp Bird acknowledged that all of the foregoing representations and warranties survived the execution of the Mining Lease, and promised to provide Caldera

with written notice if it ever became aware of information that would reasonably lead to the conclusion that such representations and warranties were false, inaccurate or misleading.

14.     By approving and adopting the Plan, which is attached as Exhibit B to the Mining Lease, Camp Bird represented and the parties understood that Caldera would be able to access the mine from the Level 3 portal.  The Plan refers to (i) hiring a road contractor to grade and prepare road access to the Level 3 portal; (ii) purchasing rail cars to accommodate the Level 3 portal;  (iii) opening and securing the portal at Level 3; and (iv) extending the "adit" (a horizontal entrance to an underground mine) at Level 3.

15.     By approving and adopting the Plan, Camp Bird also represented and the parties understood that Caldera would be able to access the mine from the Level 1 portal. The Plan refers to opening and securing the Level 1 portal.

16.     By approving and adopting the Plan, Camp Bird also represented that Caldera could access and explore the Camp Bird Mine from San Miguel County.  The Plan refers to obtaining exploration permits in San Miguel County.

17.     By approving and adopting the Plan, Camp Bird also represented that the time frame for "due diligence plus 180 days" was a reasonable time frame to evaluate the resources at the mine such that Caldera could exercise and complete the purchase option.

18.     **The Tailings Agreement.**   On or about September 20, 2012, Caldera entered into a supplemental letter agreement with Camp Bird regarding "tailings," which are finely ground rocks and mineral waste products of processing operations (the "**Tailings Agreement**").  A true and correct copy of the Tailings Agreement is attached hereto as **Exhibit B**.  The Tailings Agreement provided Caldera with the right to re-process the

tailings and keep all proceeds for itself.

19. **Caldera Spends Over $8,000,000.** After entering into the Mining Lease, Tailings Agreement, and other documents related to the transaction, Caldera spent cash in excess of $8,000,000 on the Camp Bird project. This was a substantial multiple of the budget that Camp Bird had sent to Caldera before the parties entered into the Mining Lease.

20. **Camp Bird's First Misrepresentation.** On or about January 16, 2013, Caldera received a letter from the U.S. Department of Justice ("**DOJ**") notifying it that the Camp Bird mine was the subject of litigation in the U.S District Court in Idaho (the "**Idaho Action**"), and that the federal government was claiming that Federal Resources Corp., whose principal was Bentley Blum, had fraudulently transferred its ownership of Camp Bird to the Blum Real Estate Trust. The DOJ's lawsuit later alleged alter ego claims against Federal Resources Corp., Camp Bird, the Blum Real Estate Trust and Bentley Blum.

21. The DOJ's letter was Caldera's first notice that there was a third party claim, contrary to Camp Bird's representation and warranty in the Mining Lease that Camp Bird had the right to enter into the Mining Lease and there were no third party claims. (See Mining Lease, ¶ 2.d. and f.).

22. The DOJ's letter threatened that if Caldera "purchases the mine, or further encumbers it, the United States reserve the right to pursue all remedies available under the Federal Debt Collection Practices Act, or any other authorities, with regard to that property", and stated that the DOJ would be seeking documents and deposition testimony

from Caldera.

23. **Camp Bird's Refusal to Extend Option Notice.** Caldera requested that Camp Bird extend the March 19, 2013 deadline for its exercise of the Option because Caldera (i) had not completed its due diligence to verify Camp Bird's representations and warranties in the Mining Lease, and (ii) had been prevented from identifying or verifying mineral resources so as to justify the purchase of the 60% of the mining claims for $6,500,000.

24. In response to Caldera's overtures about an extension of the deadline, Camp Bird refused to even speak with Caldera representatives on the subject.

25. **Caldera's Conditional Exercise of Option.** On March 19, 2013, Caldera gave a conditional notice of its exercise of the Option (the "**Option Notice**"). A true and correct copy of the Option Notice is attached hereto as **Exhibit C**. The Option Notice provides that the purchase transaction would close "upon Camp Bird's compliance with all requirements and conditions of the Mining Lease".

26. The Mining Lease provides that the Option payment was due thirty days after the Option Notice.

27. In order to conduct further due diligence, and to allow snow to melt thereby permitting an evaluation of access to the mine, Caldera paid Camp Bird additional money to extend the Option payment deadline until June 1, 2013.

28. **The Stipulation to Sequester Funds.** On or about April 18, 2013, Caldera, Camp Bird and the U.S. entered into a Stipulation in the Idaho Action which provided that Caldera's anticipated payment to Camp Bird pursuant to the Option would be sequestered

in an escrow account and used to satisfy the obligations to the U.S. owed by Camp Bird.

29.     Pursuant to the Stipulation, the U.S. received a deed of trust on all Camp Bird property in the amount of the obligation owed to the U.S. by Camp Bird.

30.     The Stipulation provides that "Nothing herein affects in any way Caldera's rights against Camp Bird under the Agreements."

31.     **Camp Bird's Additional Misrepresentations.**  In May 2013, as it continued its due diligence, Caldera discovered that Camp Bird had made the following additional material misrepresentations in the Mining Lease:

32.     ***Misrepresentation re: Level 3 access.***  Prior to entering into the Mining Lease, Caldera discovered that Camp Bird had lost certain mining claims in the vicinity of the Level 3 portal due to a tax deed sale.  Camp Bird represented to Caldera that the Level 3 portal occurred on its property and that and furthermore that the tax deed sale was invalid due to improper notice and could be readily overturned. Camp Bird thus represented and warranted in the Mining Lease that Caldera would be able to access the mine through the Level 3 portal.

33.     Camp Bird's representations were false. Caldera discovered that (i) Camp Bird did not own property on which the Level 3 portal is located; (ii) Camp Bird did not have the right to challenge the tax deed sale; (iii) even if Caldera acquired such right, the cost, delay and risk of legal action were prohibitive; (iv) there was no reasonable prospect for a deal with the owner of the Level 3 portal; and (v) there were no other reasonable alternative locations to the Level 3 portal because the only alternative locations are on a large rock glacier or in avalanche chutes which have destroyed historical portals.

34.     Camp Bird's representations that Caldera would be able to access the mine from the Level 3 portal were highly material. The Level 3 portal is the most critical access point to the Camp Bird Mine for resource identification and safety purposes. Not only was Caldera prevented from identifying and verifying mineral resources, but federal and state mining regulations require secondary access to any underground mine for emergency escape and ventilation purposes.  The Level 3 access is the *only* secondary access for emergency purposes at the mine.  Without secondary access, mining operations cannot be conducted.

35.     ***Misrepresentation re: Level 1 access.***  Camp Bird represented and warranted in the Mining Lease that Caldera would be able to access the mine from the Level 1 portal.

36.     Camp Bird's representations were false.   The Level 1 portal was owned by a third party.

37.     Camp Bird's representations were material because the Level 1 portal was the only access to the uppermost regions of the mine where substantial mineral resources that were identified in historic reports needed to be verified.

38.     ***Misrepresentation re: compliance with DRMS permit.***  Camp Bird represented and warranted in the Mining Lease that it had complied with the DRMS permits.   This includes the DRMS permit relating to the "tailings pond", which is a contained area where tailings can be deposited.

39.     Camp Bird's representations were false.  The DRMS permit for the tailings pond is for an area that is approximately 50% owned by a third party, which puts it in

jeopardy of being revoked.  There is a lack of access to the tailing pond and a lack of feasible means of segregating the tailings owned by the third party.

40.     Camp Bird's representations were highly material.  Federal and state mining regulations require a permitted tailings pond to dispose of tailings produced from mining. Without a place to dump tailings, mining operations of any consequence cannot be conducted at the Camp Bird Mine.

41.     **Caldera Was Unable To Verify The Mining Resource.**  In addition to discovering that Camp Bird had made material misrepresentations in the Mining lease, Caldera was unable to verify the mining resource located at the Camp Bird property.

42.     The purpose of the Plan attached as Exhibit B to the Mining Lease was to enable Caldera to verify the mining resource at the Camp Bird property.  Caldera retained a leading minerals consulting firm, Behre Dolbear, to assist with that undertaking.

43.     On or about May 15, 2013, Behre Dolbear orally reported to Caldera that because of the lack of access to critical areas of the mine it was unable to verify mineral resources.

44.     Caldera was unable to conduct the exploration required to develop new reports because there was no access to the mine from the portals above the very lowest level of the mine.

45.     As a result of Camp Bird's misrepresentations, and Caldera's inability to identify or verify mineral resources, and the impairment to the project due to lack of tailings ownership, Caldera was unwilling to proceed with the purchase of the mine on the terms and conditions set forth in the Mining Lease.

46.    **The Continued Maintenance and Negotiations.**  From June 1, 2013 to approximately December 2014, Caldera continued in good faith to maintain the property as lessee and negotiate with Camp Bird with respect to purchasing the mine at a lower price. During this time, the U.S. threatened Caldera that if it did not complete a transaction with Camp Bird, it would take legal action against Caldera's main *investor* for Caldera's purported breach of the Stipulation.  Ultimately, Camp Bird refused to do a deal at a lower price even after acknowledging its misrepresentations.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**
**[Against Camp Bird]**

47.    Caldera incorporates by reference all prior paragraphs as though fully set forth herein.

48.    In the Mining Lease, Camp Bird was obligated to deliver to Caldera a lease and option free of third party claims; a lease and option on all of the Mining Claims listed in Exhibit A thereto; a tailings pond that was in compliance with the permit from the DRMS; access to the Level 3 portal; and access to the Level 1 portal.

49.    In the Tailings Agreement, Camp Bird was obligated to deliver to Caldera a tailings pond that Camp Bird owned and that Caldera could access.

50.    Camp Bird breached its obligations in the foregoing agreements by (i) entering into the Mining Lease knowing that there was a claim by the DOJ on all of the Mining Claims; (ii) failing to deliver to Caldera a tailings pond that was in compliance with DRMS mining regulations, that Camp Bird owned, and that Caldera could access; (iii) failing to deliver access to the Level 3 portal; and (iv) failing to deliver access to the Level

1 portal.

51.    Caldera performed all of its obligations under the Mining Lease and Tailings
Agreement, or was excused from performance.

52.    As a direct and proximate result of Camp Bird's breach of contract, Caldera
has been damaged.

WHEREFORE, Caldera prays for judgment against the Camp Bird Parties, as an
allowance of a claim against Camp Bird's bankruptcy estate and as a money judgment
against CBTMT, as follows:

a.    For actual damages of at least $8,000,000;

b.    For pre-judgment interest at the legal rate;

c.    For punitive damages, in an amount to be determined by the Court,
for Camp Bird's reckless, intentional and knowing conduct;

d.    For post-judgment interest and fees on the foregoing at the legal rate
of interest from the date of judgment until paid in full;

e.    For costs and attorney's fees;

f.    For such other and further relief as the Court may deem just and
proper.

## SECOND CLAIM FOR RELIEF
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**
**[Against Camp Bird]**

53.    Caldera incorporates by reference all prior paragraphs as though fully set

forth herein.

54. Camp Bird breached the implied covenant of good faith and fair dealing contained in the Mining Lease and Tailings Agreement by (i) entering into the Mining Lease knowing that there was a claim by the DOJ on all of the Mining Claims; (ii) failing to deliver to Caldera a tailings pond that was in compliance with DRMS mining regulations, that Camp Bird owned, and that Caldera could access; (iii) failing to deliver access to the Level 3 portal; and (iv) failing to deliver access to the Level 1 portal.

55. Caldera performed all of its obligations under the Mining Lease and Tailings Agreement, or was excused from performance.

56. As a direct and proximate result of Camp Bird's breach of the Implied Covenant of Good Faith and Fair Dealing, Caldera has been damaged.

WHEREFORE, Caldera prays for judgment against the Camp Bird Parties, as an allowance of a claim against Camp Bird's bankruptcy estate and as a money judgment against CBTMT, as follows:

      a.     For actual damages of at least $8,000,000;

      b.     For pre-judgment interest at the legal rate;

      c.     For punitive damages, in an amount to be determined by the Court, for Camp Bird's reckless, intentional and knowing conduct;

      d.     For post-judgment interest and fees on the foregoing at the legal rate of interest from the date of judgment until paid in full;

      e.     For costs and attorney's fees;

      f.     For such other and further relief as the Court may deem just and

proper.

### THIRD CLAIM FOR RELIEF
### (Intentional Misrepresentation)
### [Against Camp Bird]

57.     Caldera incorporates by reference all prior paragraphs as though fully set forth herein.

58.     Camp Bird represented and warranted in the Mining Lease that the mining permits issued by the DRMS were in good standing and had not been violated; that Camp Bird had the right to enter into the Mining Lease, and there were no third party claims; and that Camp Bird had approved and adopted the Plan and thereby impliedly approved and adopted the representations contained therein that Caldera could access the mine from the Level 3 portal and the Level 1 portal.

59.     Camp Bird represented in the Tailings Agreement that Caldera would have access to a tailings pond owned by Camp Bird.

60.     Camp Bird's representations were knowingly false when made.  The truth is as follows: (i) Camp Bird did not deliver a tailings pond that was in compliance with DRMS mining regulations, that Camp Bird owned, and that Caldera could access; (ii) Camp Bird's authority to enter into the Mining Lease was being challenged by the DOJ which was claiming that Camp Bird was the alter ego of Federal Resources Corp. and Bentley Blum; (iii) Caldera could not access the mine from the Level 3 portal because Camp Bird did not own the portal and the tax deed sale could not be reversed; and (iv) Caldera could not access the mine from the Level 1 portal because Camp Bird did not own the portal.

61. Camp Bird's representations were material. Caldera would not have entered into the Mining Lease and Tailings Agreement had it known the truth.

62. Caldera reasonably relied on Camp Bird's representations when entering into the Mining Lease.

63. As a direct and proximate result of Camp Bird's breach of the implied covenant of good faith and fair dealing, Caldera has been damaged.

WHEREFORE, Caldera prays for judgment against the Camp Bird Parties, as an allowance of a claim against Camp Bird's bankruptcy estate and as a money judgment against CBTMT, as follows:

    a.    For actual damages of at least $8,000,000;

    b.    For pre-judgment interest at the legal rate;

    c.    For punitive damages, in an amount to be determined by the Court, for Camp Bird's reckless, intentional and knowing conduct;

    d.    For post-judgment interest and fees on the foregoing at the legal rate of interest from the date of judgment until paid in full;

    e.    For costs and attorney's fees;

    f.    For such other and further relief as the Court may deem just and proper.

## FOURTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)
### [Against Camp Bird]

64. Caldera incorporates by reference all prior paragraphs as though fully set forth herein.

65.     Camp Bird represented and warranted in the Mining Lease that it owned the Mining Claims listed on Attachment A to the Mining Lease; that the mining permits issued by the DRMS were in good standing and had not been violated; that Camp Bird had the right to enter into the Mining Lease, and there were no third party claims; and that Camp Bird had approved and adopted the Plan and thereby impliedly approved and adopted the representations contained therein that Caldera could access the mine from the Level 3 portal and Level 1 portal.

66.     Camp Bird represented in the Tailings Agreement that Caldera would have access to a tailings pond owned by Camp Bird.

67.     Camp Bird had no reasonable grounds for believing that its representations were true when made.  The truth is as follows: (i) Camp Bird did not deliver a valid tailings pond permit from DRMS since approximately 50% of the permitted area was owned by a third party; (ii) Camp Bird's authority to enter into the Mining Lease was being challenged by the DOJ which was claiming that Camp Bird was the alter ego of Federal Resources Corp. and Bentley Blum; (iii) Caldera could not access the mine from the Level 3 portal because Camp Bird did not own the portal and the tax deed sale could not be reversed; and (iv) Caldera could not access the mine from the Level 1 portal because Camp Bird did not own the portal.

68.     Camp Bird's representations were material.   Caldera would not have entered into the Mining Lease and Tailings Agreement had it known the truth.

69.     Caldera reasonably relied on Camp Bird's representations when entering into the Mining Lease and when exercising the Option.

70. As a direct and proximate result of Camp Bird's negligent misrepresentation, Caldera has been damaged.

WHEREFORE, Caldera prays for judgment against the Camp Bird Parties, as an allowance of a claim against Camp Bird's bankruptcy estate and as a money judgment against CBTMT, as follows:

   a. For actual damages of at least $8,000,000;

   b. For pre-judgment interest at the legal rate;

   c. For punitive damages, in an amount to be determined by the Court, for Camp Bird's reckless, intentional and knowing conduct;

   d. For post-judgment interest and fees on the foregoing at the legal rate of interest from the date of judgment until paid in full;

   e. For costs and attorney's fees;

   f. For such other and further relief as the Court may deem just and proper.

## FIFTH CLAIM FOR RELIEF
### (Unjust Enrichment)
### [Against Camp Bird]

71. Caldera incorporates by reference all prior paragraphs as though fully set forth herein.

72. Camp Bird received the benefit of Caldera's investment of cash in excess of $8,000,000 to rehabilitate the mine.

73. Camp Bird had knowledge of the benefit.

74. Camp Bird's retention of the benefit conferred by Caldera would be

inequitable or unjust under the circumstances such that Caldera is entitled to recover the full amount of its investment from Camp Bird.

WHEREFORE, Caldera prays for judgment against the Camp Bird Parties, as an allowance of a claim against Camp Bird's bankruptcy estate and as a money judgment against CBTMT, as follows:

a.      For actual damages of at least $8,000,000;

b.      For pre-judgment interest at the legal rate;

c.      For punitive damages, in an amount to be determined by the Court, for Camp Bird's reckless, intentional and knowing conduct;

d.      For post-judgment interest and fees on the foregoing at the legal rate of interest from the date of judgment until paid in full;

e.      For costs and attorney's fees;

f.      For such other and further relief as the Court may deem just and proper.

### SIXTH CLAIM FOR RELIEF
**(Declaratory Relief)**
**[Against Camp Bird and the U.S.]**

75.      Caldera incorporates by reference all prior paragraphs as though fully set forth herein.

76.      There is an actual controversy between Caldera and Camp Bird relating to their rights and obligations arising out of or relating to the Mining Lease, the Option Notice, and the Stipulation.

77.      The United States is a necessary and indispensable party with respect to the parties' rights and obligations under the Stipulation because it is a party to the Stipulation.

WHEREFORE, Caldera prays for a judgment against the Camp Bird Parties as follows:

a.     Caldera was fraudulently induced by Camp Bird to provide the Option Notice;

b.     The Option was never exercised because the Option Notice was a conditional exercise and the conditions were never fulfilled;

c.     Any obligation of Caldera to perform under the Option was excused due to the prior breach of contract or fraud by Camp Bird, mistake, impossibility, impracticability, frustration of purpose, and/or coercion; and

d.     The Stipulation is not enforceable because it (i) is simply a sequestration order which directs Caldera to pay into an escrow account whatever funds it owes Camp Bird; (ii) preserves Caldera's rights to challenge the enforceability of the underlying agreements with Camp Bird which agreements are not enforceable against Caldera; and (iii) is not supported by any new consideration;

e.     For costs and attorney's fees; and

f.     For such other and further relief as the Court may deem just and proper.

DATED: December 30, 2015          **LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.**


By:___*/s/ Martin J. Brill*_____
        **Martin J. Brill**
        **Krikor J. Meshefejian**
        *Counsel for Creditors Caldera Mineral Resources, LLC and Caldera Holdings, LLC, Pro Hac Vice Application Approved*

And

**AFFELD GRIVAKES ZUCKER LLP**


By:    */s/ Christopher Grivakes*
        **Christopher Grivakes**
*Counsel for Creditors Caldera Mineral Resources, LLC and Caldera Holdings, LLC, Pro Hac Vice Application Approved*

        and

M. Darin Hammond – Bar No. 6741
**SMITH KNOWLES, P.C.**
2225 Washington Blvd., Suite 200
Ogden, UT  84401
Telephone:    (801) 476-0303
Facsimile:    (801) 476-0399
dhammond@smithknowles.com

*Local Counsel for Creditors Caldera Mineral Resources, LLC*
*and Caldera Holdings, LLC*

Exhibit A

## MINING LEASE AND OPTION TO PURCHASE

THIS MINING LEASE AND OPTION TO PURCHASE (this "Agreement") is made this 20th day of September, 2012 ("Effective Date"), by and between CALDERA `MINERAL RESOURCES, LLC, a Delaware limited liability company with a principal place of business located at c/o Monadnock Mineral Services, P.O. Box 85, Ouray, CO 81427, Attn.: Bob Larson ("CMR"), and CAMP BIRD COLORADO, INC., a Colorado corporation with a principal place of business located at 15811 Fisher Island Drive, Miami, Florida 33109 ("Owner"). CMR and Owner each may be referred to herein as a "Party," and collectively they may be referred to herein as the "Parties."

### WITNESSETH:

In consideration of SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($600,000.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and CMR agree as follows:

**1. DEFINITIONS.** The following capitalized terms shall have the meanings set forth below:

a) "Lien" means that certain first and prior Deed of Trust, Security Agreement, Financing Statement and Assignment of Rents granted by Owner to Caldera Holdings, LLC, a Delaware limited liability company, or its successors and assigns, in connection with this Agreement and the option described in Section 17 below, and as further delineated in the Joint Venture Agreement attached hereto as *Exhibit D* ("JV Agreement").

b) "Minerals" means all ores, precious and base metalliferous minerals, nonmetallic minerals, and sands and gravels of every kind, whether lode or placer, locatable or non-locatable, in, on, under or associated with the Mining Claims.

c) "Mining Claims" means the patented mining claims located in Ouray County, Colorado, as more fully described in *Exhibit A*, attached hereto.

d) "Phase 1 Plan" means the operating plan attached hereto as *Exhibit B*.

e) "Property" means the total undivided real property interest in the Mining Claims held by the Owner, together with all of Owner's incident or appurtenant easements and other real property rights, options and other interests, including, but not limited to all of Owners' rights to the use of water in connection with activities on the Mining Claims, whether now held or hereafter acquired.

**2. REPRESENTATIONS AND WARRANTIES.** Owner represents and warrants to CMR that:

a) Owner owns the entire right, title and interest to, and has exclusive possession of, the Mining Claims, and there are no third party mining or millsite claims which conflict with any mining claim included within the Mining Claims;

b) Except with respect to the Lien, and as set forth in Subsection 2.l) below, the Property is free and clear of all liens, clouds, encumbrances and adverse claims of third parties, and that there are no suits, actions, prosecutions, investigations or proceedings, actual, pending or threatened, that relate to the Property or could have any adverse effect whatsoever on the Owner's representations hereunder or the actions contemplated by this Agreement;

c) To Owner's knowledge existing mineral and reclamation permit issued by the Colorado Division of Reclamation Mining and Safety concerning the Property ("DRMS Permit"), as well as any use authorizations required by Ouray or San Miguel Counties, are in good standing and there exists no violation of any of the same;

d) Owner has good and valid right and authority to make and deliver this Agreement, and Owner will not be in breach or violation of any other agreement or obligation (written or oral) by entering into or performing this Agreement or any transaction contemplated by this Agreement;

e) Other than that certain Reservation of Perpetual Gross Royalty of even date in favor of Owner, the Property is not burdened with, and the Minerals are not subject to, any royalties, overriding royalties or payments on production;

f) There exist no third party interests or claims of interest in the Property or the Minerals, and neither the Property nor the Minerals are subject to any prior agreement, encumbrance, burden or restriction created before the Effective Date by any act or instrument of Owner except as set forth in Subsection 2.l) below;

g) The person executing this Agreement on behalf of Owner is fully authorized to do so, and this Agreement constitutes a legal, valid and binding obligation enforceable against Owner in accordance with its terms;

h) To Owner's knowledge, there are no toxic or hazardous substances on the Property, other than native mineralization in place;

i) Owner has approved (and the timeliness of such approval is acknowledged by CMR) and adopted the Phase 1 Plan after Owner and its legal, financial and tax advisors had the opportunity to review the Phase 1 Plan and ask questions of and receive answers from CMR, or from a person or persons acting on CMR's behalf, concerning the Phase 1 Plan. Owner further represents and warrants that its approval and adoption of the Phase 1 Plan is not contingent upon any guaranty or representation by any party that is not included in the Phase 1 Plan;

j) As of the Effective Date, the Mining Claims constitutes all of the mining claims within the area described in *Exhibit C*, attached hereto (the "Area of Interest"), to which Owner has any right, title or interest;

k) Owner or others with Owner's permission have conducted mining or industrial operations or activities upon the Property prior to the date of this Agreement, but to Owner's knowledge there has been no violation of any applicable laws, including environmental laws, in connection therewith. For the term of this Agreement, Owner hereby irrevocably assigns to CMR any and all rights of indemnity, if any, which Owner may have or hold, from or against any third parties for any damages arising from such activities, if any, conducted by such third parties.

l)    Deeds of Trust dated January 1, 2007 and April 21, 2008 securing a note payable to Dufford & Brown, P.C. in the original principal amount of $180,000 are the only liens or encumbrances on the Mining Claims. Any balance remaining on such note at the time of exercise of the Option pursuant to Section 17 shall be payable out of amounts otherwise due Owner upon exercise.

All foregoing representations shall survive the execution of this Agreement, and, in the event Owner has knowledge or becomes aware of information that would reasonably lead to the conclusion that any of the foregoing representations or warranties are false, inaccurate or

misleading at any time during the term of this Agreement, Owner shall immediately provide CMR with written notice of such knowledge or information.

## 3. GRANT

a) Owner hereby grants, lets and leases exclusively to CMR, its successors and assigns, the Property for the term hereof, together with all Minerals, with the exclusive right to prospect and explore for, drill, develop, mine and extract by any method now known or hereafter discovered (including, but not limited to, surface, underground, open pit, in-situ and solution methods), process by any method now known or hereafter discovered, mill, refine, prepare for market, store, sell and dispose of the Minerals; together with the right: to use all such structures, facilities, equipment, non-public roadways and rights-of-way, easements, and all other appurtenances installed on, used or usable in connection with the Mining Claims for the purposes permitted hereunder; to cross and recross other lands owned and controlled by Owner in the vicinity of the Mining Claims if necessary for purposes of ingress or egress to and from the Mining Claims; and to use all water, water rights and water wells used or usable in connection with the Mining Claims for the purposes permitted hereunder. In the event Owner acquires any additional rights, titles or interests in the Mining Claims after the execution of this Agreement, all such additional rights, titles and interests shall be subject to this Agreement

b) In the event either Party now owns or hereafter acquires Minerals (or an interest therein) in any tracts of land, all or any portion of which lies within the Area of Interest, that are not Mining Claims as of the Effective Date, the acquiring Party shall give notice of such ownership to the other Party and, at the other Party's election, and within ninety (90) days after being made aware of such ownership by the acquiring Party, the other Party shall give written notice to the acquiring Party as to whether such tract shall or shall not be included as part of the Property under this Agreement ("Election Notice"). If the other Party timely elects to include such a tract, it shall be deemed part of the Property subject to this Agreement without the need for CMR to pay any additional AR. If the other Party elects not to include such tract within the Property, or fails to timely deliver an Election Notice, that tract shall be deemed not to have been made part of the Property and shall be free and clear of this Agreement. The acquisition cost of any property or claims added to the Property pursuant to this subsection 3.b) shall be paid or reimbursed by CMR and shall constitute an allowed expenditure under the Phase 1 Plan, as described in subsection 6.a). If an acquisition from a third party becomes part of the Property under this subsection, and requires payment of a royalty or payment based upon production to the third party as a condition of acquisition, the royalty payable to Owner pursuant to that certain Reservation of Perpetual Gross Royalty of even date shall be reduced (but not below zero) by any royalty payable to the third party.

c) Owner hereby further grants exclusively to CMR, its successors and assigns, the right to review all documents concerning title to and the mineral potential of the Mining Claims, including, but not limited to, all drilling and assay records, all historic production records, all geological and environmental studies and reports, and all title reports and opinions, surveys and location notices related to the Mining Claims. All such existing documents shall be delivered to CMR on or before the twentieth (20th) day following the Effective Date. All such documents coming into the possession of Owner after the Effective Date shall be delivered to CMR within twenty (20) days of Owner's possession of same.

d) Subject to the foregoing, unless otherwise elected by CMR, no dispute between Owner and CMR shall interrupt or cause suspension of any of CMR's operations on or in connection with

the Property and no such dispute shall cause or justify any impoundment, escrow, injunction or similar arrangement.

e) It is the intent of the Parties that this Agreement shall be exhaustive of all Owner's rights associated with the Mining Claims and the Minerals and shall include, but not be limited to, all of the rights granted by the State of Colorado or the United States, as well as any other rights to the Mining Claims or Minerals of whatsoever nature or kind that Owner may possess on the Effective Date of this Agreement.

## 4. TERM.

a) Unless sooner terminated as provided in this Agreement, the term of this Agreement shall be for a primary period of ten (10) years from the Effective Date ("Initial Term").

b) Provided that Commercial Mining Operation are underway on the Property at the end of the Initial Term set forth in Section 4.a) above, CMR shall have the option to extend the primary term of this Agreement for an additional period of ten (10) years ("Subsequent Term"). "Commercial Mining Operations" shall mean the active drilling, development, mining or extracting of Minerals in conformance with the Phase I Plan that has not ceased after commencement for a continuous period of more than twenty-four (24) months, provided that if CMR has commenced material exploration operations at the end of the Initial Term and thereafter diligently continues such exploration, development and commencement of production in commercial quantities, the same shall be considered as Commercial Mining Operations. In order to exercise such option, CMR shall provide notice of its election prior to the end of the Initial Term and shall also tender the AR payment set forth in Section 5.a)ii for the subsequent calendar year. If the term has been extended pursuant to this paragraph, it may be extended further by compliance with the conditions for extension stated herein prior to the end of the Subsequent Term under the plan then being implemented.

c) Notwithstanding any termination, expiration or surrender of this Agreement, CMR shall nevertheless have the right of ingress and egress to and from the Property and the right to complete such reclamation and restoration of the Property and to make such inspections as may be required by law for so long after termination of this Agreement as is reasonably necessary to complete all such reclamation, restoration and inspections. The foregoing notwithstanding, Owner shall remain solely responsible for, and shall bear all liability regarding, any environmental conditions existing upon the Property on the Effective Date that are not the direct result of CMR's operations hereunder.

## 5. ROYALTY PAYMENTS.

a) In order to maintain this Agreement in effect, CMR shall pay to Owner the following advance royalty payments ("AR"):

    i.    Initial AR in the amount of SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($600,000.00) shall be paid by CMR to Owner on the Effective Date. The Parties agree that: (A) payment of the initial AR as described in this clause is a single, one-time payment that satisfies CMR's AR obligation for the entire Initial Term; and (B) the full amount of the initial AR shall be included in the amounts secured by the Lien. Certain amounts paid in connection with operations described in the Phase 1 Plan prior to the effective date are also included in the Lien.

ii.     During the Subsequent Term, CMR shall pay annually to Owner AR on or before the anniversary of the Effective Date of this Agreement, commencing on the tenth (10th) anniversary, at a rate per annum equal to TEN AND NO/100 DOLLARS ($10.00) per Mining Claim that remains part of the Property. No AR shall be payable to Owner with respect to mining claims CMR locates or to property CMR acquires from any third party. All payments of subsequent AR may be made by CMR's check, in a single payment, and delivery thereof shall be deemed completed on the mailing or other delivery to Owner as follows:

> Camp Bird Colorado, Inc.
> 40 Cuttermill Road, Suite 201
> Great Neck, NY 11021

In addition to the AR, CMR shall further perform on behalf of Owner such acts and obligations and make such filings as are reasonably and customarily related to maintaining the Mining Claims in compliance with local, state and federal laws. Owner agrees to cooperate with CMR and to take such reasonable actions, execute and deliver such reasonable documents, and otherwise provide such reasonable assistance as may be useful or necessary to permit CMR to comply with the provisions of this Section.

b) Unless otherwise arising as a consequence of CMR's execution of the JV Agreement pursuant to *Section 17* below, Owner shall not be entitled to receive payment of any production royalty from CMR.

### 6.  WORK PLAN.

a) CMR shall perform its development and operating activities with respect to the Mining Claims pursuant to the Phase 1 Plan; *provided, however,* that any costs and expenses in excess of a total of FIVE MILLION, SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($5,600,000.00) shall be approved by Owner before being incurred, unless such expenditure is necessary to comply with applicable law or to avoid imminent harm or damage to persons or property.

b) All activities carried out by CMR under this Agreement shall be carried out in conformance with the laws and regulations of the State of Colorado and the United States. The lease granted herein includes the exclusive, complete and unrestricted right to enter, occupy, use, prospect, drill, sample, tunnel, evaluate, and control the Mining Claims in accordance with this Agreement, together with the right to place thereon, erect, construct, use, maintain and remove such structures, buildings, facilities, equipment, machinery, wells, roadways, trackage, haulageways and such other improvements as CMR, in its sole judgment, may deem necessary, useful or convenient in conducting such operations on the Mining Claims and in connection with adjoining or nearby properties and to use and consume, for stockpiles, waste dumps, tailings impoundments, rock or ore in connection with exploration, evaluation and development, so much of the Mining Claims as may be reasonably necessary, useful or convenient for the full enjoyment of the rights herein granted.

c)  As a condition to CMR's performance hereunder, Owner shall:

i.     Execute and cause its affiliate, Camp Bird Tunnel, Mining and Transportation Company, to execute the Irrevocable License for Use of Water of even date herewith granting first priority right to use all water rights owned by them, inclusive of those rights

-5-

related to the water flowing through the Camp Bird Tunnel, to CMR for uses necessary for its performance of mining, processing and related operations under this Agreement;

ii.     Cooperate fully with CMR in acquiring and maintaining any permits it deems necessary or advisable in relation to its performance of the activities permitted hereunder; and

iii.     Use best efforts to assist CMR in recovering, by negotiation or legal proceedings undertaken at CMR's cost, properties owned by Owner and conveyed of record in treasurer's deeds issued on February 17, 2010 by the Ouray County Treasurer and February 29, 2012 by the San Miguel County Treasurer.

d) Owner agrees that CMR may operate during the term of this Agreement under Owner's existing DRMS Permit, provided that CMR shall prepare and file any technical revisions to such permit necessary to undertake the Phase 1 Plan, and shall post any additional financial assurances required to implement such technical revisions.

### 7. TITLE CURE; AMENDMENT AND RELOCATION.

a) Owner shall make available such abstracts of title and other title records pertaining to the Property which Owner may have to aid CMR in any title searching it may wish to undertake. CMR may, but shall have no obligation to, investigate and cure as it sees fit any defects in title to the Property which Owner fails to remedy after notice by CMR. Owner shall cooperate fully with CMR in the curing of any such title defect. With respect to any expenses incurred by CMR in this effort or incurred by Owner and reimbursed by CMR, CMR may include such expenses in the amounts secured by the Lien.

b) CMR shall have the right, but shall not be required, to amend, relocate, abandon and then relocate, topfile, overstake, or stake fractional unpatented mining claims covering gaps between all or any of the Mining Claims and to convert any such unpatented mining claims to millsite claims if and when CMR has determined that the land included therein is nonmineral in character. All actions taken by CMR under this Section shall be taken by CMR at CMR's sole expense and on behalf and in the name of Owner. Mining or millsite claims staked, amended, relocated, or patented by CMR pursuant to the provisions of this Section shall be deemed part of the Mining Claims and shall be subject to this Agreement. CMR shall not be liable or responsible to Owner for any reduction in the record or possessory title of Owner to any of the Property which may result from any action taken by CMR under this Agreement, and no such action shall constitute or be deemed to be a breach of any of CMR's obligations to Owner hereunder, *provided* that such action is taken by CMR in the good faith belief that the same is necessary in order to confirm, protect or preserve the rights of Owner in the Property or CMR's rights hereunder.

8. INSPECTION. CMR's records of all mining operations on the Property shall be available for Owner's inspection upon reasonable advance notice and during normal business hours, but no more than once each quarter. Subject to CMR's safety requirements and instructions, representatives of Owner may enter the mine workings and structures on the Mining Claims at all reasonable times upon reasonable advance notice for inspection thereof, but each representative of Owner shall so enter at his/her own risk and shall indemnify and hold CMR harmless against and from any damage, loss or liability by reason of injury to Owner or his/her agents or representatives or damage to or destruction of any property of Owner or said agents or representatives while on the Mining Claims on or in said mine workings and structures.

-6-

9. CONFIDENTIALITY. Each Party agrees to hold in confidence this Agreement and all information related to the operations contemplated hereunder disclosed to it directly or indirectly by any other Party or any of its affiliates; *provided, however*, the obligations of confidentiality shall not apply to information that at the time of disclosure is generally available to the public; information that after disclosure is published or otherwise becomes generally available to the public through no fault of the recipient (but only after, and only to the extent that, it is published or otherwise becomes generally available to the public); information that the recipient can show already was in the possession of the recipient or its affiliates at the time of disclosure (except in anticipation of this Agreement) and that without breach of any obligation of confidence such recipient is free to disclose to others; information deemed by CMR to be reasonably necessary for the preparation of studies necessary to determine the commercial feasibility and/or viability of the Mining Claims; or information that the recipient reasonably believes is required to be disclosed by applicable law or stock exchange rules.

10. TAXES. CMR shall pay all taxes assessed against any personal property which it may place on the Property and shall pay any real property taxes attributable to the period of time the Option is in effect. CMR has paid the 2011 taxes to protect the Property and agrees to pay the 2012 taxes payable in 2013. All such amounts shall be included in the Lien. Owner shall provide promptly to CMR copies of all documents it receives relating to such taxes. CMR may take such action, at its expense, as it deems proper to obtain a reduction or refund of taxes paid or payable by it, and Owner shall cooperate in such action, including but not limited to allowing such action to be taken and prosecuted in Owner's name.

11. LIENS.

a) CMR shall keep the Property free of all liens for labor or materials furnished to it in its operations hereunder and shall indemnify and save harmless Owner against and from any damage, loss or liability by reason of injury to person or damage to property as the result of its operations hereunder, except as provided in *Section 8* above. CMR may, but shall have no obligation to, contest the validity of any lien of the Property at its expense, and Owner shall cooperate in such contest, including but not limited to allowing such contest to be taken and prosecuted in Owner's name, and any such lien shall not be deemed a default unless finally adjudicated to be valid and not discharged by CMR.

b) Owner shall not cause or allow any liens, encumbrances or adverse claims to accrue against the Property. In the event any lien or encumbrance shall hereafter accrue against the Property by act or neglect of Owner, then CMR may, at CMR's option, pay and discharge the same. With respect to any amounts paid by CMR pursuant to the preceding sentence, such amount shall be included in the amounts secured by the Lien.

12. TERMINATION.

a) CMR shall have the right at any time to terminate this Agreement upon thirty (30) days written notice to Owner. CMR may release from this Agreement, from time to time, portions of the Mining Claims only with written permission of the Owner (hereinafter a "Partial Release"). With respect to any unpatented mining claims or other properties located by CMR or leased or otherwise acquired from third parties and included in the Property, CMR may propose abandonment of claims, termination of lease rights or sale or other disposition of the same at any time. If Owner objects to such abandonment, termination or disposition, Owner shall be entitled to require an assignment or conveyance of all of CMR's rights in such properties to Owner, provided that Owner expressly agrees in writing to assume all obligations and liabilities

-7-

in connection with such properties or interests, except as provided in Section 12.d) below. An approved Partial Release of any of the Mining Claims listed in *Exhibit A* shall reduce the AR payable during the Subsequent Term as a function of the number of claims so released. In the event of a Partial Release or relinquishment of any Property pursuant to this Section 12.a), each party agrees to grant to the other such easements across their respective properties as the other may need for access to properties in which it holds or continues to hold an interest for purposes of exploration, development, mining and reclamation of such properties.

b) This Agreement shall terminate upon exercise and fulfillment of all conditions precedent to the option set forth in Section 17 and the transfer of title to an undivided 60% interest in the Mining Claims pursuant thereto

c) Notwithstanding anything to the contrary herein, in the event CMR does not exercise its option set forth in Section 17, either Party may terminate this Agreement on fifteen (15) days prior written notice to the other Party. Any termination of this Agreement pursuant to this Section 12.c) shall also terminate the Irrevocable License concerning use of Water, and the provisions of Section 12.8 of the JV Agreement described in Section 17 shall apply as to Owner's resumption of control and operation of the Property.

d) Upon termination of this Agreement, or a Partial Release, as the case may be, all payments theretofore made to Owner shall be retained by Owner and all liabilities and obligations of CMR to Owner not then due or accrued shall cease and terminate, except any liabilities or obligations arising prior to termination or which survive termination. The Lien and any liability of CMR for all environmental conditions resulting directly from CMR's operations on the Property shall survive any termination or Partial Release.

13. DEFAULT. If CMR defaults in any of its obligations hereunder, Owner may give CMR written notice thereof specifying the default(s). If the default involves only an obligation to pay monies, CMR shall have fifteen (15) days from receipt of such notice to cure the default. In any other circumstance, CMR shall have sixty (60) days from receipt of such notice to cure the default unless it is of a nature that sixty (60) days is insufficient time in which to cure. In this event, CMR shall commence efforts to cure such default within the sixty (60) days, and shall continue such efforts until the default is cured. If CMR in good faith disputes that a default has occurred, then CMR shall so advise Owner in writing giving all available reasons to support the position. Thereafter, if the Parties continue to dispute the existence of a default, the matter may be resolved or determined by litigation in a court of competent jurisdiction, and the Parties shall have at their respective disposals all legal and equitable remedies allowed by applicable law, *provided* that no termination shall occur until sixty (60) days after judgment of default and failure to cure.

14. FORCE MAJEURE. Except for the obligation to make payments when due hereunder, the obligations of CMR shall be suspended to the extent and for the period that performance is prevented by any cause, whether foreseeable or unforeseeable, beyond its reasonable control, including, without limitation, labor disputes (however arising and whether or not employee demands are reasonable or within the power of CMR to grant); acts of God; federal, state and local laws (statutory or common), rules, ordinances, regulations, grants, concessions, franchises, licenses, orders, directives, judgments, orders, decrees, and other governmental restrictions, including permits and other similar requirements, whether legislative, municipal, administrative or judicial in nature; instructions or requests of any government or governmental entity; inability to obtain on reasonably acceptable terms any public or private license, permit or other authorization; curtailment or suspension of activities to remedy or avoid an actual or

-8-

alleged, present or prospective violation of Environmental Laws (as defined in the JV Agreement); action or inaction by any federal, state or local agency that delays or prevents the issuance or granting of any approval or authorization required to conduct Operations (as defined in the JV Agreement) beyond the reasonable expectations of the Party seeking the approval or authorization; acts of war or conditions arising out of or attributable to war, whether declared or undeclared; riot, civil strife, insurrection or rebellion; fire, explosion, earthquake, storm, flood, sink holes, drought or other adverse weather condition; delay or failure by suppliers or transporters of materials, parts, supplies, services or equipment or by contractors' or subcontractors' shortage of, or inability to obtain, labor, transportation, materials, machinery, equipment, supplies, utilities or services; accidents; breakdown of equipment, machinery or facilities; actions by native rights groups, environmental groups, or other similar special interest groups; inability to gain access or permits for access to the Property; inability to obtain qualified drillers and other workers or equipment for Operations; decline in metal prices to levels materially below recent historic values that prevent on a temporary basis removal of ore at Operating Expenses (as defined in the JV Agreement) less than such current prices; or any other cause whether similar or dissimilar to the foregoing. CMR shall promptly give notice to Owner of the suspension of performance, stating therein the nature of the suspension, the reasons therefor, and the expected duration thereof. CMR shall resume performance as soon as reasonably possible.

15. PERSONAL PROPERTY. In case of termination of this Agreement under the terms hereof or for any cause other than the exercise of the option described in Section 17, CMR shall have no liability or obligation hereunder except for those, including reclamation obligations, already accrued at such date of termination. Upon such termination, CMR shall surrender the Mining Claims to Owner and shall deliver to it a written instrument in further evidence of such termination, in appropriate form for recording. CMR shall have the right but not the obligation, to remove from the Property all property belonging to it (collectively, "Personal Property") but not machinery and equipment or other materials installed as part of CMR's obligation under the Phase 1 Plan, except that, if and to the extent the cost of acquisition of any Personal Property has been charged as an amount subject to the Lien, title to such Personal Property shall revert to Owner. If CMR desires to abandon any Personal Property that is not subject to the Lien, CMR shall give Owner notice that Owner may elect to allow such Personal Property to remain, and Owner may then take possession and ownership of such Personal Property.

16. RIGHT OF FIRST REFUSAL.

a) During the term of this Agreement, Owner agrees that if Owner should receive a bona fide offer acceptable to it from a third party to purchase all or any part of the Property, the Mining Claims and/or interest in this Agreement ("Option Property"), Owner shall give immediate written notice to CMR, setting forth the price and terms (inclusive of financing) and including a copy of the bona fide offer from such third party ("Option Notice"). In such event, CMR may, within thirty (30) days following receipt of the Option Notice, elect by written notice given to Owner to purchase the entire interest sought by the third party in the Option Property on the terms and conditions specified in the Option Notice, as supplemented with customary representations and warranties from Owner and the provisions hereof. In the event CMR fails to elect to purchase in said manner and within said period of time, Owner shall then and thereafter be free to sell the Option Property specified in the Option Notice to the third party making the offer in accordance with the terms and conditions specified in the Option Notice, subject to the Lien and the terms and conditions set forth herein, including, but not limited to, *Section 17 below; provided, however,* that if for any reason closing of the third party transaction for such Option Property is not completed within ninety (90) days after CMR receives the Option Notice, this right of first

-9-

refusal shall be revived in favor of CMR and notice of any subsequent bona fide offers acceptable to Owner shall be given to CMR upon the same terms and conditions for acceptance and rejection as hereinabove provided.

b) In accordance with the provisions of this Section, Owner shall grant, transfer, assign, and convey to CMR all of Owner's right, title and interest in the portion of the Mining Claims purchased, as well as all appurtenances, tenements, rights, easements, licenses, rights and privileges belonging thereto or benefitting that property, by executing and delivering to CMR a special warranty deed in a form reasonably acceptable to CMR, together with any other documents, deeds, instruments or declarations required to fully vest title to same in CMR, within two (2) business days after CMR tenders the purchase price set forth in the Option Notice (reduced by the amount of the Lien), or places the same in escrow. All general real estate taxes, special assessments and general assessments levied against such property shall be apportioned as of such date according to the calendar year, using the last available tax duplicate for rate and valuation, and CMR shall pay any recording fees, transfer taxes and legal fees in connection with the deed preparation. In further consideration of monies paid by CMR: (i) Owner will cooperate fully in obtaining such assurances or other accommodations from third parties to confirm the validity of the title conveyed to CMR; and (ii) to the extent reasonably required by CMR to develop the Mining Claims, Owner shall grant easements and right of way to CMR over adjacent property of Owner to facilitate such development in a form reasonably acceptable to CMR. The rights accruing to CMR under this Section may be assigned without the consent of the Owner.

c) The Parties agree that during the term of this Agreement, they shall not do any act or thing which would defeat, prejudice or diminish the rights of the other party under this Section; *provided, however*, that nothing herein shall limit CMR's option to deliver to Owner, or the effectiveness of, a JV Notice (*as defined below*).

## 17. JOINT VENTURE OPTION

a) Owner grants CMR the irrevocable option to purchase a sixty percent (60%) undivided interest in the Mining Claims for a total aggregate purchase price equal to SIX MILLION, FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($6,500,000.00) ("JV Price"). CMR may exercise this option at any time on or prior to March 19, 2013 by giving Owner notice in writing of its election to do so ("JV Notice"). On or before the thirtieth (30th) day following delivery of the JV Notice: (i) CMR shall deliver to an escrow agent selected by CMR and acceptable to Owner ("Escrow Agent") the JV Price and an executed copy of the JV Agreement; and (ii) Owner shall deliver to Escrow Agent an executed copy of the JV Agreement and a duly executed and notarized Special Warranty Deed (in a form reasonably satisfactory to CMR).

b) Upon full delivery by each party, Escrow Agent shall release the JV Price, less the amount necessary to release any liens made or suffered by Owner prior to the Effective Date or without the permission of CMR, to Owner and the Special Warranty Deed to CMR, this Agreement shall terminate, and the Property shall thereafter be developed and operated in accordance with the JV Agreement.

c) The option described in this Section shall terminate if not exercised on or prior to March 19, 2013. In furtherance of the foregoing: (i) the right to exercise such option shall not be limited by the delivery of any Option Notice pursuant to Section 16; and (ii) the Parties agree that, during the term of this Agreement, they shall not do any act or thing which would defeat, prejudice or diminish the rights of the other Party under this Section.

-10-

18. NOTICES. All notices hereunder shall be in writing and may be delivered by certified mail, or by personal delivery, and such mailing thereof, or personal delivery, shall be deemed the act of giving of notice. Such notices shall be addressed to Owner as follows:

CAMP BIRD COLORADO, INC.
15811 Fisher Island Drive
Miami, Florida 33109
Attn: Bentley J. Blum
Tel: 305-534-8023
Fax: 305-534-8122
Email: bjbmail@aol.com

And to CMR, as follows:

CALDERA MINERAL RESOURCES, LLC
c/o Monadnock Mineral Services
P.O. Box 85
Ouray, CO 81427
Attn.: Bob Larson
Tel: 970-325-4600
Cell: 970-318-1430
E-mail: larsouray@qwestoffice.net

With a copy to:

A. John A. Bryan Jr.
Chief Executive Officer
The Watley Group, LLC
8439 Sunset Boulevard, Suite 402
West Hollywood, CA 90069
Telephone: 310-777-8889
Email: jbryan@watley.com

and to

Abraham Advocates and Solicitors
19 Keppel Road #09-05
Jit Poh Building
Singapore 089058
Attn: Mohan R. Abraham
Tel: (65) 6513 2382
Fax: (65) 6323 0291
Email: mohan@abrahamlawoffice.com

Any demand or notice of default or termination to CMR from Owner shall be effective only if signed by all persons identified in this Agreement as being an Owner.

19. USAGE. All defined terms as used herein include the plural, and reference to one gender includes the other and the plural when appropriate.

-11-

20. MEMORANDUM FOR RECORDING. Owner and CMR shall execute a Memorandum of Mining Lease and Agreement covering the Property for purposes of recording substantially in the form of *Exhibit E* hereto. Owner shall not record this Agreement without CMR's prior written consent.

21. ASSIGNMENT. Subject to *Sections 16* and *17*, Owner may assign its rights under this Agreement, in whole or in part, and this Agreement shall be binding upon and inure to the benefit of the Parties hereto, their heirs, executors, administrators, successors and assigns. CMR may assign this Agreement in whole or in part at any time to any other party upon written notice to Owner.

22. COUNTERPARTS. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, taken together, shall constitute a single agreement.

23. U.S. DOLLARS. All dollar amounts are in US currency.

24. GOVERNING LAW. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Colorado.

25. ENTIRE AGREEMENT. This Agreement supersedes all prior written and verbal understandings and agreements of the Parties, including without limitation that certain Camp Bird Mine Memorandum of Understanding between Owner and Copper King Mining Corporation, now assigned to CMR, dated effective June 22, 2012. This Agreement sets forth the entire understanding between the Parties and may be modified or amended only in writing by an instrument signed by the Party to be charged with such modification or amendment. This Agreement shall not be construed to contain any implied consideration, warranties, representations, or covenants, including any implied obligation of CMR to explore, mine or otherwise work the Mining Claims or extract Minerals, beyond the specific undertakings set forth herein and is not intended to create any partnership between the Parties.

26. FURTHER DOCUMENTATION. The Parties agree that they will execute such further agreements, conveyances and assurances as the Parties may deem necessary to carry out this Agreement.

27. SEVERABILITY. If any part of this Agreement is found invalid for any reason by a court of competent jurisdiction, that part shall be deemed severed from this Agreement only to the extent necessary to remedy such invalidity and will not affect the validity of the remaining parts of this Agreement.

-12-

**IN WITNESS WHEREOF**, the Parties have executed this Mining Lease and Option Agreement
as of the Effective Date above written.

| Caldera Mineral Resources, LLC | Camp Bird Colorado, Inc. |
|---|---|
| By: | By: _____ |
| Name: | Name: _____ |
| Title: C E O | Title: _____ |

STATE OF _____ )
                                                      ) SS.
COUNTY OF _____ )

On this _____ day of September, 2012, _____ personally
appeared before me, a Notary Public, who acknowledged that he/she executed the foregoing
instrument as _____ of Caldera Mineral Resources, LLC, a Delaware
limited liability company.

_____
Notary Public

STATE OF _____ )
                                                      ) SS.
COUNTY OF _____ )

On this _____ day of September, 2012, _____ personally
appeared before me, a Notary Public, who acknowledged that he/she executed the foregoing
instrument as _____ of Camp Bird Colorado, Inc., a Colorado
corporation.

_____
Notary Public

-13-

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of LOS ANGELES

On 09.22.12 before me, JASON MIRZA NOTARY PUBLIC
Date                         Here Insert Name and Title of the Officer

personally appeared ANTHONY JOHN ADRIAN BRYAN JR.
Name(s) of Signer(s)

JASON MIRZA
Commission # 1973615
Notary Public - California
Los Angeles County
My Comm. Expires Mar 30, 2016

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                    Signature of Notary Public

Place Notary Seal Above

--- **OPTIONAL** ---

Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.

**Description of Attached Document**

Title or Type of Document: MINING LEASE AND OPTION TO PURCHASE

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: _____ | Signer's Name: _____ |
| ☐ Individual | ☐ Individual |
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General | ☐ Partner — ☐ Limited ☐ General |
| ☐ Attorney in Fact | ☐ Attorney in Fact |
| ☐ Trustee | ☐ Trustee |
| ☐ Guardian or Conservator | ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org Item #5907 Reorder: Call Toll-Free 1-800-876-6827

**IN WITNESS WHEREOF**, the Parties have executed this Mining Lease and Option Agreement as of the Effective Date above written.

| Caldera Mineral Resources, LLC | Camp Bird Colorado, Inc. |
|---|---|
| By: _____ | By: _Scott A Butters_ |
| Name: _____ | Name: _SCOTT A. BUTTERS_ |
| Title: _____ | Title: _PRESIDENT_ |

STATE OF _____ )
                                ) SS.
COUNTY OF _____ )

On this _____ day of September, 2012, _____ personally appeared before me, a Notary Public, who acknowledged that he/she executed the foregoing instrument as _____ of Caldera Mineral Resources, LLC, a Delaware limited liability company.

_____
Notary Public

STATE OF _UTAH_ )
                ) SS.
COUNTY OF _Davis_ )

On this 21ST day of September, 2012, _Scott Butters_ personally appeared before me, a Notary Public, who acknowledged that he/she executed the foregoing instrument as _PRESIDENT_ of Camp Bird Colorado, Inc., a Colorado corporation.

_____
Notary Public

N. DEV NIELSON
Notary Public
State of Utah
My Commission Expires Nov. 17, 2013
Commission #: 561010

-13-

## EXHIBIT A

### MINING CLAIMS

### Camp Bird Colorado, Inc. Mining Claims

| Treasurer Account # | Mineral Survey Number | Claim Name | Acres |
|---|---|---|---|
| N004550 | MS 20281 | AFRICA | 6.40 |
| N004550 | MS 721A | AGNES | 10.31 |
| N004550 | MS 20281 | AGNEW | 11.63 |
| N004550 | MS 16094 | AGUINALDE | 9.88 |
| N004550 | MS 15181 | ALDEN | 7.17 |
| N004550 | MS 11969 | APACHE | 6.29 |
| N004550 | MS 17489A | BABCOCK 1 | 9.94 |
| N004757 | MS 14776 | BALSAM | 9.39 |
| N004757 | MS 14772 | BARNABY | 9.40 |
| N004550 | MS 14773 | BASUTO | 3.43 |
| N004550 | MS 13406 | BIRDSEYE | 10.33 |
| N004550 | MS 16041 | BLACK QUAIL | 7.54 |
| N004550 | MS 17489A | BLEWSOME | 9.21 |
| N004550 | MS 17381 | BODEGA | 6.98 |
| N004550 | MS 17489A | BO SMITH 1 | 10.25 |
| N004550 | MS 17489A | BO SMITH 2 | 7.20 |
| N004550 | MS 14450 | BOXER | 6.97 |
| N004550 | MS 16094 | BRYANT | 10.27 |
| N004550 | MS 164 | BUCKEYE GIRL | 10.33 |
| N004550 | MS 13402 | CABANAS | 7.34 |
| N004550 | MS 11611 | CAMP BIRD | 7.03 |
| N004550 | MS 12165 | CANUCK | 10.33 |
| N004550 | MS 16096 | CHANNEL | 6.63 |
| N004550 | MS 1642 | CHICAGO | 10.33 |
| N004550 | MS 15370 | COMPASS | 1.98 |
| N004550 | MS 16155 | CONEY | 10.33 |
| N004757 | MS 723A | CONQUEROR | 9.50 |
| N004550 | MS 723B | CONQUEROR MS | 5.00 |
| N004550 | MS 14776 | CONSTANCE | 10.25 |
| N004550 | MS 15198 | CORONADO | 10.33 |
| N004550 | MS 14773 | COSMOS | 1.00 |
| N004550 | MS 13402 | COURIER | 3.79 |

| | | | |
|---|---|---|---|
| N004550 | MS 16242 | COUSIN JACK | 8.16 |
| N004550 | MS 575 | CRUSADER | 10.33 |
| N004550 | MS 16041 | DAISY | 9.36 |
| N004550 | MS 12877 | DAMON | 0.10 |
| N004550 | MS 12637A | DEADWOOD | 6.55 |
| N004757 | MS 12637B | DEADWOOD | 4.97 |
| N004550 | MS 722A | DECLARATION | 10.31 |
| N004757 | MS 722B | DECLARATION MS | 5.00 |
| N004550 | MS 17489A | DIPPER | 8.58 |
| N004550 | MS 12876 | DIVIDE | 0.16 |
| N004550 | MS 14450 | DODO | 9.98 |
| N004550 | MS 18203A | DOMINGO | 9.94 |
| N004550 | MS 18203A | DOMINGO 2 | 6.87 |
| N004550 | MS 17489A | DUTCHESS | 9.03 |
| N004550 | MS 547A | EMILY | 9.39 |
| N004757 | MS 547B | EMILY MS | 5.00 |
| N004550 | MS 17489A | ENSIGN | 10.17 |
| N004550 | MS 17489A | ENTOMOLOGIST | 9.53 |
| N004550 | MS 17489A | EQUATOR | 9.77 |
| N004550 | MS 17489A | EQUINOX | 8.97 |
| N004550 | MS 12949A | EVANGELINE | 6.98 |
| N004550 | MS 12949B | EVANGELINE MS | 0.79 |
| N004550 | MS 4852 | FIRST NATIONAL | 10.33 |
| N004550 | MS 17489A | FOX | 10.33 |
| N004550 | MS 1548A | GERTRUDE | 10.24 |
| N004757 | MS 1548B | GERTRUDE MS | 5.00 |
| N004757 | MS 535A | GLEN MONARCH | 10.33 |
| N004757 | MS 535B | GLEN MONARCH MS | 3.14 |
| N004550 | MS 17112 | GOLD NUGGET PLACER | 19.88 |
| N004550 | MS 18750 | GORE | 0.33 |
| N004550 | MS 14776 | HAGER | 8.96 |
| N004550 | MS 16096 | HALIFAX | 5.82 |
| N004550 | MS 2132 | HANCOCK | 9.58 |
| N004550 | MS 15195 | HECKLA | 10.33 |
| N004550 | MS 16094 | HELLESPONT | 8.52 |
| N004550 | MS 15195 | HESTER | 9.65 |
| N004550 | MS 16095 | HIGH LINE | 8.52 |
| N004550 | MS 15198 | HONOLULU | 2.52 |
| N004550 | MS 16094 | HUMMING BIRD | 10.27 |
| N004550 | MS 16041 | IDAHO | 9.57 |

| | | | |
|---|---|---|---|
| N004550 | MS 161 | IMOGENE | 10.20 |
| N004550 | MS 17489A | IRON MAN | 9.35 |
| N004550 | MS 12031 | IVANHOE | 10.05 |
| N004550 | MS 11969 | JICARILLA | 8.24 |
| N004550 | MS 14450 | JUNEAU | 8.92 |
| N004550 | MS 14450 | JUNEAU 2 | 9.10 |
| N004550 | MS 16095 | KEYSTONE | 0.98 |
| N004550 | MS 15473 | KING EDWARD | 8.28 |
| N004550 | MS 16095 | KOKOMO | 9.90 |
| N004550 | MS 14450 | KOOTENAI | 7.98 |
| N004550 | MS 8239A | LAUNAKA | 9.85 |
| N004550 | MS 8239B | LAUNAKA MS | 5.00 |
| N004550 | MS 16094 | MANILLA | 5.62 |
| N004550 | MS 14787 | MATANZAS | 0.55 |
| N004550 | MS 17489A | MEMORANDA | 10.19 |
| N004550 | MS 16041 | MIDNIGHT | 8.56 |
| N004550 | MS 16094 | MILES | 6.49 |
| N004550 | MS 17489A | MODOC | 8.71 |
| N004550 | MS 11969 | MOJAVE | 8.35 |
| N004550 | MS 15405 | MONTE CARLO | 9.38 |
| N004550 | MS 11969 | MOQUI | 7.46 |
| N004550 | MS 16236 | MORAINE | 10.33 |
| N004550 | MS 17318 | NOOTKA | 6.29 |
| N004550 | MS 17318B | NOOTKA MS | 4.90 |
| N004550 | MS 546A | NORMA | 10.33 |
| N004550 | MS 546B | NORMA MS | 5.00 |
| N004550 | MS 15473 | OLD IRELAND | 5.51 |
| N004550 | MS 13402 | OLYMPIA | 7.63 |
| N004550 | MS 16095 | OMEGA | 9.35 |
| N004550 | MS 20280 | ONLY ONE | 13.77 |
| N004550 | MS 11969 | ORO CACHE | 9.97 |
| N004550 | MS 16094 | OTIS | 9.80 |
| N004550 | MS 15370 | PALO ALTO | 9.13 |
| N004550 | MS 16041 | POLAR BEAR | 5.44 |
| N004550 | MS 15181 | PRISCILLA | 9.02 |
| N004550 | MS 12877 | PYTHIAS | 6.89 |
| N004550 | MS 13406 | RANCHERO | 6.36 |
| N004550 | MS 18750 | REBECCA | 3.30 |
| N004550 | MS 12748 | RIGEL | 2.50 |

-3-

| | | | |
|---|---|---|---|
| N004550 | MS 13406 | ROCK LAKE | 8.06 |
| N004757 | MS 14772 | RUDGE | 9.27 |
| N004550 | MS 15474 | SARACEN | 10.33 |
| N004550 | MS 13406 | SCORCHER | 10.33 |
| N004550 | MS 12875 | SCORIFIER | 2.33 |
| N004550 | MS 15405 | SEBASTOPOL | 10.29 |
| N004550 | MS 16095 | SKYSCRAPER | 0.10 |
| N004550 | MS 17489A | SNAPSHOT | 10.33 |
| N004550 | MS 16094 | SPENCER | 4.90 |
| N004550 | MS 15370 | ST. PAUL | 9.46 |
| N004550 | MS 15181 | STANDISH | 7.81 |
| N004757 | MS 17309 | SUN LIGHT PLACER | 39.57 |
| N004550 | MS 13992 | TAM O SHANTER | 10.04 |
| N004550 | MS 16041 | TIGER | 10.19 |
| N004550 | MS 16155 | TIPPERARY | 9.88 |
| N004550 | MS 14776 | TOM MOORE | 7.72 |
| N004550 | MS 15405 | TRAMP | 10.31 |
| N004550 | MS 17344 | TUSCARORA | 3.91 |
| N004550 | MS 11611 | TUSCOLA | 10.31 |
| N004550 | MS 738A | UNA | 10.38 |
| N004550 | MS 738B | UNA MS | 4.99 |
| N004550 | MS 17381A | US TREASURY | 10.33 |
| N004550 | MS 17381B | US TREASUR EXT | 10.33 |
| N004550 | MS 14776 | VERNE | 5.44 |
| N004757 | MS 6476B | VIRGINIUS MS | 4.85 |
| N004550 | MS 17489A | WHITE FLAG | 5.92 |
| N004550 | MS 16041 | WHITE QUAIL | 10.01 |
| N004550 | MS 16236 | WHITE SCUD | 10.33 |
| N004550 | MS 15405 | WHITE SWEDE | 10.28 |
| N004550 | MS 16041 | WYOMING | 9.24 |
| N004550 | MS 12031 | YALLER DORG | 10.33 |
| N004550 | MS 15473 | YELLOW BIRD | 8.16 |
| N004757 | MS 576A | YELLOW ROSE | 10.22 |
| N004550 | MS 576B | YELLOW ROSE | 5.00 |
| N004550 | MS 12876 | ZEPHYR | 6.60 |
| | **Total Acres** | | **1,186.25** |

## EXHIBIT B

## PHASE 1 PLAN

Duration:        Phase 1 (Due diligence plus 180 days)

Objective:       1. Accomplish Phase 1 Conditions
                 2. Prepare mine so continued exploration and evaluation can be done during winter
                 3. Evaluation and exploration of mine

Items to be Accomplished and Evaluated:

a. Verify mine claims

b. Make mine visit to examine mine access, road conditions, and general layout

c. Engage our full Phase 1 mining team of employees and consultants

d. Make preparations to file for MSHA permit and ID number
        (1) Contact and contract with Mine Rescue Team
        (2) Contact and contract with Safety Training Team
        (3) Task training plan
        (4) Ventilation plan
        (5) Emergency exit plan

e. File for exploration and evaluation permit
        (1) Notification to San Miguel County
        (2) Notification to State of Colorado
        (3) Environmental permits

f. Hire road contractor to grade and prepare road access to level 14 and level 3

g. Purchase mine access materials, mine safety materials, core drill, and drilling materials
        (1) Compressor
        (2) Generator and transformers
        (3) Rail cars to accommodate level 3 and 14 rails as described in the MOU
        (4) Piping and electrical line repairs
        (5) Repair or replace man lifts in rises, as described in the MOU
        (6) Core drill (termite drill and accessories)

h. Purchase and locate modular units for mine office, dry space, and utilities

i. Contract for 3D mine survey map

j. Hire mine contractor through bid and familiarity process (Williams Brothers or others)
        (1) Open and secure portals and adits to levels 1, 2, 3 and 14
        (2) Extend adits at levels 2 and 3
        (3) Install safety equipment
        (4) Open all needed access points including rises from 14 to 3 level
        (5) Repair or set rail where needed to move overburden
        (6) Prepare mine as much as possible for winter operations

k. Hire drilling contract crew to operate dill
        (1) Under supervision of geologist, drill core samples

l. Purchase sample preparation equipment

m. Contract with analytical laboratory for analysis of samples

## EXHIBIT C

### AREA OF INTEREST

The "Area of Interest" shall mean any parcels of lands or mineral interests that lie, in whole or in part, within five (5) miles from the boundary of any of the Mining Claims listed in Exhibit A. Such parcels or interests shall include (but are not limited to) all areas that have been, are being, or may be used for exploration, mining, extracting, producing, beneficiating, handling, milling or other processing of Minerals.

**EXHIBIT D**

**JOINT VENTURE AGREEMENT**

Exhibit B

CALDERA MINERAL RESOURCES, LLC
c/o Monadnock Mineral Services
P.O. Box 85
Ouray, CO 81427
September 20, 2012

CAMP BIRD COLORADO, INC.
15811 Fisher Island Drive
Miami, Florida 33109
Attn: Bentley J. Blum

Re: Supplemental agreement regarding tailings.

Gentlemen:

Caldera Mineral Resources ("Caldera") has entered into that certain Mining Lease with Option to
Purchase ("Option") of even date with Camp Bird Colorado, Inc. ("CBC") concerning exploration,
development and mining for Minerals (as defined in the Option) from the Camp Bird Mine property that
is the subject of the Option. Terms used in this letter and not otherwise defined have the meaning set
forth in the Option or in the Exhibit or other instrument referenced in the Option (collectively,
"Transaction Documents") in which any such term is defined. This letter sets forth certain supplemental
understandings of the parties in connection with the Option and the JV Agreement that is attached as an
Exhibit to the Option.

1.      Tailings. There are substantial tailings from historic mining and processing operations located
on the Mining Claims that are subject to the Option ("Tailings"). Notwithstanding any provision to the
contrary in the Transaction Documents, and whether considered part of the Property or as being merely
an Asset located on the Mining Claims, the following provisions apply:

        (a)     The Tailings will not be considered Minerals, Subject Minerals or Products under any of
the Transaction Documents.

        (b)     Caldera can remove all or any part of the Tailings and, if it desires, process them and sell
them or minerals extracted from them without any payment to CBC.

        (c)     If removed or processed, those Tailings will be deemed solely owned by Caldera.

        (d)     Tailings removed or processed will not be considered part of the 50,000 tons of ore
contemplated to be extracted under the Phase 1 Plan in the Option or under Phase 2 in the JV
Agreement.

601590241.1

(e)    No Production Royalty under the Reservation of Perpetual Gross Royalty of even date ("Reserved Royalty") executed by CBC will be payable on tailings removed pursuant to subparagraph (b), above.

(f)    If there are revenues from the Tailings in excess of cost of removal of Tailings, the amount of such net revenue will be applied by Caldera and its parent, Caldera Holdings, LLC, to reduce the amount of the Lien evidenced by the Deed of Trust of even date recorded against the Property.

2.    Data. CBC will promptly supply all technical and other data regarding the San Miguel County properties that were conveyed in a treasurer's deed to third parties as well as any data concerning Ouray or San Miguel County properties within the Area of Interest now or previously owned by CBC.

3.    Liens. CBC represents and warrants that the total amount secured by any deeds of trust from CBC in favor of Dufford & Brown, P.C., do not exceed $185,000. CBC further represents and warrants that, notwithstanding the existence of a deed of trust in favor of the JJR Trust appearing of record, the indebtedness secured by that deed of trust has been paid in full. CBC covenants and agrees that it will cause CHH Operating Company to subordinate the lien of its deed of trust on the Mining Claims to the Deed of Trust in favor of Caldera Holdings, LLC, granted in connection with the Transaction Documents.

4.    Termination. This letter shall expire on September 20, 2015, or upon "termination" pursuant to paragraph 12 of the Option.

Kindly acknowledge CBC's agreement as to the foregoing matters by executing a counterpart of this letter as provided below and returning it to us.

Sincerely,

For Caldera Mineral Resources, LLC

Camp Bird hereby acknowledges and agrees to the foregoing terms and conditions.

CAMP BIRD COLORADO, INC.,

By: _____

_____
_____ (Title)

(e)      No Production Royalty under the Reservation of Perpetual Gross Royalty of even date ("Reserved Royalty") executed by CBC will be payable on tailings removed pursuant to subparagraph (b), above.

(f)      If there are revenues from the Tailings in excess of cost of removal of Tailings, the amount of such net revenue will be applied by Caldera and its parent, Caldera Holdings, LLC, to reduce the amount of the Lien evidenced by the Deed of Trust of even date recorded against the Property.

2.       Data. CBC will promptly supply all technical and other data regarding the San Miguel County properties that were conveyed in a treasurer's deed to third parties as well as any data concerning Ouray or San Miguel County properties within the Area of Interest now or previously owned by CBC.

3.       Liens. CBC represents and warrants that the total amount secured by any deeds of trust from CBC in favor of Dufford & Brown, P.C., do not exceed $185,000. CBC further represents and warrants that, notwithstanding the existence of a deed of trust in favor of the JJR Trust appearing of record, the indebtedness secured by that deed of trust has been paid in full. CBC covenants and agrees that it will cause CHH Operating Company to subordinate the lien of its deed of trust on the Mining Claims to the Deed of Trust in favor of Caldera Holdings, LLC, granted in connection with the Transaction Documents.

4.       Termination. This letter shall expire on September 20, 2015, or upon "termination" pursuant to paragraph 12 of the Option.

Kindly acknowledge CBC's agreement as to the foregoing matters by executing a counterpart of this letter as provided below and returning it to us.

Sincerely,

For Caldera Mineral Resources, LLC

Camp Bird hereby acknowledges and agrees to the foregoing terms and conditions.

CAMP BIRD COLORADO, INC.,

By: _____

_____ (Title)

601590241.1

(e)     No Production Royalty under the Reservation of Perpetual Gross Royalty of even date ("Reserved Royalty") executed by CBC will be payable on tailings removed pursuant to subparagraph (b), above.

(f)     If there are revenues from the Tailings in excess of cost of removal of Tailings, the amount of such net revenue will be applied by Caldera and its parent, Caldera Holdings, LLC, to reduce the amount of the Lien evidenced by the Deed of Trust of even date recorded against the Property.

2.      Data. CBC will promptly supply all technical and other data regarding the San Miguel County properties that were conveyed in a treasurer's deed to third parties as well as any data concerning Ouray or San Miguel County properties within the Area of Interest now or previously owned by CBC.

3.      Liens. CBC represents and warrants that the total amount secured by any deeds of trust from CBC in favor of Dufford & Brown, P.C., do not exceed $185,000. CBC further represents and warrants that, notwithstanding the existence of a deed of trust in favor of the JJR Trust appearing of record, the indebtedness secured by that deed of trust has been paid in full. CBC covenants and agrees that it will cause CHH Operating Company to subordinate the lien of its deed of trust on the Mining Claims to the Deed of Trust in favor of Caldera Holdings, LLC, granted in connection with the Transaction Documents.

4.      Termination. This letter shall expire on September 20, 2015, or upon "termination" pursuant to paragraph 12 of the Option.

Kindly acknowledge CBC's agreement as to the foregoing matters by executing a counterpart of this letter as provided below and returning it to us.

Sincerely,

_____

For Caldera Mineral Resources, LLC

Camp Bird hereby acknowledges and agrees to the foregoing terms and conditions.

CAMP BIRD COLORADO, INC.,

By: _Scott A Butters_
     _Scott A. Butters_
     _PRESIDENT_         (Title)

Exhibit C

CALDERA MINERAL RESOURCES, LLC
c/o Monadnock Mineral Services
P.O. Box 85
Ouray, CO 81427

March 19, 2013

Via Certified Mail, Return Receipt Requested
Personal delivery via FedEx

Camp Bird Colorado, Inc.
15811 Fisher Island Drive
Miami, Florida 33109
Attn: Bentley J. Blum

Re: Notice of Exercise of Joint Venture Option

Dear Mr. Blum:

Pursuant to Section 17.a) of that certain Mining Lease and Option to Purchase dated as of the 20th day of September, 2012 ("Mining Lease"), by and between Caldera Mineral Resources, LLC ("CMR"), as lessee and optionee, and Camp Bird Colorado, Inc. ("CBCI") as Owner, CMR hereby gives CBCI notice that it elects to exercise its option to purchase a sixty percent undivided interest in the Mining Claims, as defined in the Mining Lease. (All capitalized terms used herein shall have the meaning ascribed to them in the Mining Lease unless otherwise defined.)

As soon as possible, and in any event within 30 days following delivery of this notice, CMR will designate an Escrow Agent, deliver to the Escrow Agent the JV Price and a counterpart of the JV Agreement executed by CMR, thereby putting CMR in a position to close the transaction upon CBCI's compliance with all requirements and conditions required of Owner under the Mining Lease.

We will shortly advise you of the Escrow Agent CMR has selected and the form of Special Warranty Deed that will be satisfactory to CMR in connection with the closing. We will also supply a form of the JV Agreement suitable for execution by CBCI, all as contemplated by Section 17.a) and 17.b) of the Mining Lease.

Also, in view of the Prejudgment Writ of Sequestration, obtained by the United States of America in *United States of America v. Federal Resources Corp.*, Case no 2:11-cv-00127-BLW, United States District Court for the District of Idaho, you are notified that CMR is delivering a copy of this notice to the Court and the counsel of record for the United States in such case and intends to advise those parties of any release or proposed release of funds due CBCI in connection with the exercise of the option described above. This notice is authorized under Section 9 of the Mining Lease because it is information that CMR believes is required to be disclosed by applicable law.

Sincerely,

A. John A. Bryan Jr.
for Caldera Mineral Resources, LLC

cc:     The Watley Group, LLC
        8439 Sunset Boulevard, Suite 402
        West Hollywood, CA 90069

Abraham Advocates and Solicitors
19 Keppel Road #09-05
Jit Poh Building
Singapore 089058
Attn: Mohan R. Abraham
Fax: (65) 6323 0291
Email: mohan@abrahamlawoffice.com

Exhibit A

## MINING LEASE AND OPTION TO PURCHASE

THIS MINING LEASE AND OPTION TO PURCHASE (this "Agreement") is made this 20th day of September, 2012 ("Effective Date"), by and between CALDERA MINERAL RESOURCES, LLC, a Delaware limited liability company with a principal place of business located at c/o Monadnock Mineral Services, P.O. Box 85, Ouray, CO 81427, Attn.: Bob Larson ("CMR"), and CAMP BIRD COLORADO, INC., a Colorado corporation with a principal place of business located at 15811 Fisher Island Drive, Miami, Florida 33109 ("Owner"). CMR and Owner each may be referred to herein as a "Party," and collectively they may be referred to herein as the "Parties."

### WITNESSETH:

In consideration of Six HUNDRED THOUSAND AND NO/100 DOLLARS ($600,000.00) and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Owner and CMR agree as follows:

1. **DEFINITIONS.** The following capitalized terms shall have the meanings set forth below:

a) "Lien" means that certain first and prior Deed of Trust, Security Agreement, Financing Statement and Assignment of Rents granted by Owner to Caldera Holdings, LLC, a Delaware limited liability company, or its successors and assigns, in connection with this Agreement and the option described in Section 17 below, and as further delineated in the Joint Venture Agreement attached hereto as *Exhibit D* ("JV Agreement").

b) "Minerals" means all ores, precious and base metalliferous minerals, nonmetallic minerals, and sands and gravels of every kind, whether lode or placer, locatable or non-locatable, in, on, under or associated with the Mining Claims.

c) "Mining Claims" means the patented mining claims located in Ouray County, Colorado, as more fully described in *Exhibit A*, attached hereto.

d) "Phase 1 Plan" means the operating plan attached hereto as *Exhibit B*.

e) "Property" means the total undivided real property interest in the Mining Claims held by the Owner, together with all of Owner's incident or appurtenant easements and other real property rights, options and other interests, including, but not limited to all of Owners' rights to the use of water in connection with activities on the Mining Claims, whether now held or hereafter acquired.

2. **REPRESENTATIONS AND WARRANTIES.** Owner represents and warrants to CMR that:

a) Owner owns the entire right, title and interest to, and has exclusive possession of, the Mining Claims, and there are no third party mining or millsite claims which conflict with any mining claim included within the Mining Claims;

b) Except with respect to the Lien, and as set forth in Subsection 2.l) below, the Property is free and clear of all liens, clouds, encumbrances and adverse claims of third parties, and that there are no suits, actions, prosecutions, investigations or proceedings, actual, pending or threatened, that relate to the Property or could have any adverse effect whatsoever on the Owner's representations hereunder or the actions contemplated by this Agreement;

c) To Owner's knowledge existing mineral and reclamation permit issued by the Colorado Division of Reclamation Mining and Safety concerning the Property ("DRMS Permit"), as well as any use authorizations required by Ouray or San Miguel Counties, are in good standing and there exists no violation of any of the same;

d) Owner has good and valid right and authority to make and deliver this Agreement, and Owner will not be in breach or violation of any other agreement or obligation (written or oral) by entering into or performing this Agreement or any transaction contemplated by this Agreement;

e) Other than that certain Reservation of Perpetual Gross Royalty of even date in favor of Owner, the Property is not burdened with, and the Minerals are not subject to, any royalties, overriding royalties or payments on production;

f) There exist no third party interests or claims of interest in the Property or the Minerals, and neither the Property nor the Minerals are subject to any prior agreement, encumbrance, burden or restriction created before the Effective Date by any act or instrument of Owner except as set forth in Subsection 2.l) below;

g) The person executing this Agreement on behalf of Owner is fully authorized to do so, and this Agreement constitutes a legal, valid and binding obligation enforceable against Owner in accordance with its terms;

h) To Owner's knowledge, there are no toxic or hazardous substances on the Property, other than native mineralization in place;

i) Owner has approved (and the timeliness of such approval is acknowledged by CMR) and adopted the Phase 1 Plan after Owner and its legal, financial and tax advisors had the opportunity to review the Phase 1 Plan and ask questions of and receive answers from CMR, or from a person or persons acting on CMR's behalf, concerning the Phase 1 Plan. Owner further represents and warrants that its approval and adoption of the Phase 1 Plan is not contingent upon any guaranty or representation by any party that is not included in the Phase 1 Plan;

j) As of the Effective Date, the Mining Claims constitutes all of the mining claims within the area described in *Exhibit C*, attached hereto (the "Area of Interest"), to which Owner has any right, title or interest;

k) Owner or others with Owner's permission have conducted mining or industrial operations or activities upon the Property prior to the date of this Agreement, but to Owner's knowledge there has been no violation of any applicable laws, including environmental laws, in connection therewith. For the term of this Agreement, Owner hereby irrevocably assigns to CMR any and all rights of indemnity, if any, which Owner may have or hold, from or against any third parties for any damages arising from such activities, if any, conducted by such third parties.

l)  Deeds of Trust dated January 1, 2007 and April 21, 2008 securing a note payable to Dufford & Brown, P.C. in the original principal amount of $180,000 are the only liens or encumbrances on the Mining Claims. Any balance remaining on such note at the time of exercise of the Option pursuant to Section 17 shall be payable out of amounts otherwise due Owner upon exercise.

All foregoing representations shall survive the execution of this Agreement, and, in the event Owner has knowledge or becomes aware of information that would reasonably lead to the conclusion that any of the foregoing representations or warranties are false, inaccurate or

misleading at any time during the term of this Agreement, Owner shall immediately provide CMR with written notice of such knowledge or information.

### 3. GRANT

a) Owner hereby grants, lets and leases exclusively to CMR, its successors and assigns, the Property for the term hereof, together with all Minerals, with the exclusive right to prospect and explore for, drill, develop, mine and extract by any method now known or hereafter discovered (including, but not limited to, surface, underground, open pit, in-situ and solution methods), process by any method now known or hereafter discovered, mill, refine, prepare for market, store, sell and dispose of the Minerals; together with the right: to use all such structures, facilities, equipment, non-public roadways and rights-of-way, easements, and all other appurtenances installed on, used or usable in connection with the Mining Claims for the purposes permitted hereunder; to cross and recross other lands owned and controlled by Owner in the vicinity of the Mining Claims if necessary for purposes of ingress or egress to and from the Mining Claims; and to use all water, water rights and water wells used or usable in connection with the Mining Claims for the purposes permitted hereunder. In the event Owner acquires any additional rights, titles or interests in the Mining Claims after the execution of this Agreement, all such additional rights, titles and interests shall be subject to this Agreement

b) In the event either Party now owns or hereafter acquires Minerals (or an interest therein) in any tracts of land, all or any portion of which lies within the Area of Interest, that are not Mining Claims as of the Effective Date, the acquiring Party shall give notice of such ownership to the other Party and, at the other Party's election, and within ninety (90) days after being made aware of such ownership by the acquiring Party, the other Party shall give written notice to the acquiring Party as to whether such tract shall or shall not be included as part of the Property under this Agreement ("Election Notice"). If the other Party timely elects to include such a tract, it shall be deemed part of the Property subject to this Agreement without the need for CMR to pay any additional AR. If the other Party elects not to include such tract within the Property, or fails to timely deliver an Election Notice, that tract shall be deemed not to have been made part of the Property and shall be free and clear of this Agreement. The acquisition cost of any property or claims added to the Property pursuant to this subsection 3.b) shall be paid or reimbursed by CMR and shall constitute an allowed expenditure under the Phase 1 Plan, as described in subsection 6.a). If an acquisition from a third party becomes part of the Property under this subsection, and requires payment of a royalty or payment based upon production to the third party as a condition of acquisition, the royalty payable to Owner pursuant to that certain Reservation of Perpetual Gross Royalty of even date shall be reduced (but not below zero) by any royalty payable to the third party.

c) Owner hereby further grants exclusively to CMR, its successors and assigns, the right to review all documents concerning title to and the mineral potential of the Mining Claims, including, but not limited to, all drilling and assay records, all historic production records, all geological and environmental studies and reports, and all title reports and opinions, surveys and location notices related to the Mining Claims. All such existing documents shall be delivered to CMR on or before the twentieth (20th) day following the Effective Date. All such documents coming into the possession of Owner after the Effective Date shall be delivered to CMR within twenty (20) days of Owner's possession of same.

d) Subject to the foregoing, unless otherwise elected by CMR, no dispute between Owner and CMR shall interrupt or cause suspension of any of CMR's operations on or in connection with

the Property and no such dispute shall cause or justify any impoundment, escrow, injunction or
similar arrangement.

e)  It is the intent of the Parties that this Agreement shall be exhaustive of all Owner's rights
associated with the Mining Claims and the Minerals and shall include, but not be limited to, all of
the rights granted by the State of Colorado or the United States, as well as any other rights to
the Mining Claims or Minerals of whatsoever nature or kind that Owner may possess on the
Effective Date of this Agreement.

## 4.  TERM.

a)  Unless sooner terminated as provided in this Agreement, the term of this Agreement shall
be for a primary period of ten (10) years from the Effective Date ("Initial Term").

b)  Provided that Commercial Mining Operation are underway on the Property at the end of the
Initial Term set forth in Section 4.a) above, CMR shall have the option to extend the primary
term of this Agreement for an additional period of ten (10) years ("Subsequent Term").
"Commercial Mining Operations" shall mean the active drilling, development, mining or
extracting of Minerals in conformance with the Phase I Plan that has not ceased after
commencement for a continuous period of more than twenty-four (24) months, provided that if
CMR has commenced material exploration operations at the end of the Initial Term and
thereafter diligently continues such exploration, development and commencement of production
in commercial quantities, the same shall be considered as Commercial Mining Operations.  In
order to exercise such option, CMR shall provide notice of its election prior to the end of the
Initial Term and shall also tender the AR payment set forth in Section 5.a)ii for the subsequent
calendar year.  If the term has been extended pursuant to this paragraph, it may be extended
further by compliance with the conditions for extension stated herein prior to the end of the
Subsequent Term under the plan then being implemented.

c)  Notwithstanding any termination, expiration or surrender of this Agreement, CMR shall
nevertheless have the right of ingress and egress to and from the Property and the right to
complete such reclamation and restoration of the Property and to make such inspections as
may be required by law for so long after termination of this Agreement as is reasonably
necessary to complete all such reclamation, restoration and inspections.  The foregoing
notwithstanding, Owner shall remain solely responsible for, and shall bear all liability regarding,
any environmental conditions existing upon the Property on the Effective Date that are not the
direct result of CMR's operations hereunder.

## 5.  ROYALTY PAYMENTS.

a)  In order to maintain this Agreement in effect, CMR shall pay to Owner the following advance
royalty payments ("AR"):

i.        Initial AR in the amount of SIX HUNDRED THOUSAND AND NO/100 DOLLARS
($600,000.00) shall be paid by CMR to Owner on the Effective Date. The Parties agree
that: (A) payment of the initial AR as described in this clause is a single, one-time
payment that satisfies CMR's AR obligation for the entire Initial Term; and (B) the full
amount of the initial AR shall be included in the amounts secured by the Lien. Certain
amounts paid in connection with operations described in the Phase 1 Plan prior to the
effective date are also included in the Lien.

-4-

ii. During the Subsequent Term, CMR shall pay annually to Owner AR on or before the anniversary of the Effective Date of this Agreement, commencing on the tenth (10th) anniversary, at a rate per annum equal to TEN AND NO/100 DOLLARS ($10.00) per Mining Claim that remains part of the Property. No AR shall be payable to Owner with respect to mining claims CMR locates or to property CMR acquires from any third party. All payments of subsequent AR may be made by CMR's check, in a single payment, and delivery thereof shall be deemed completed on the mailing or other delivery to Owner as follows:

> Camp Bird Colorado, Inc.
> 40 Cuttermill Road, Suite 201
> Great Neck, NY 11021

In addition to the AR, CMR shall further perform on behalf of Owner such acts and obligations and make such filings as are reasonably and customarily related to maintaining the Mining Claims in compliance with local, state and federal laws. Owner agrees to cooperate with CMR and to take such reasonable actions, execute and deliver such reasonable documents, and otherwise provide such reasonable assistance as may be useful or necessary to permit CMR to comply with the provisions of this Section.

b) Unless otherwise arising as a consequence of CMR's execution of the JV Agreement pursuant to *Section 17* below, Owner shall not be entitled to receive payment of any production royalty from CMR.

## 6. WORK PLAN.

a) CMR shall perform its development and operating activities with respect to the Mining Claims pursuant to the Phase 1 Plan; *provided, however,* that any costs and expenses in excess of a total of FIVE MILLION, SIX HUNDRED THOUSAND AND NO/100 DOLLARS ($5,600,000.00) shall be approved by Owner before being incurred, unless such expenditure is necessary to comply with applicable law or to avoid imminent harm or damage to persons or property.

b) All activities carried out by CMR under this Agreement shall be carried out in conformance with the laws and regulations of the State of Colorado and the United States. The lease granted herein includes the exclusive, complete and unrestricted right to enter, occupy, use, prospect, drill, sample, tunnel, evaluate, and control the Mining Claims in accordance with this Agreement, together with the right to place thereon, erect, construct, use, maintain and remove such structures, buildings, facilities, equipment, machinery, wells, roadways, trackage, haulageways and such other improvements as CMR, in its sole judgment, may deem necessary, useful or convenient in conducting such operations on the Mining Claims and in connection with adjoining or nearby properties and to use and consume, for stockpiles, waste dumps, tailings impoundments, rock or ore in connection with exploration, evaluation and development, so much of the Mining Claims as may be reasonably necessary, useful or convenient for the full enjoyment of the rights herein granted.

c) As a condition to CMR's performance hereunder, Owner shall:

i. Execute and cause its affiliate, Camp Bird Tunnel, Mining and Transportation Company, to execute the Irrevocable License for Use of Water of even date herewith granting first priority right to use all water rights owned by them, inclusive of those rights

-5-

related to the water flowing through the Camp Bird Tunnel, to CMR for uses necessary for its performance of mining, processing and related operations under this Agreement;

ii. Cooperate fully with CMR in acquiring and maintaining any permits it deems necessary or advisable in relation to its performance of the activities permitted hereunder; and

iii. Use best efforts to assist CMR in recovering, by negotiation or legal proceedings undertaken at CMR's cost, properties owned by Owner and conveyed of record in treasurer's deeds issued on February 17, 2010 by the Ouray County Treasurer and February 29, 2012 by the San Miguel County Treasurer.

d) Owner agrees that CMR may operate during the term of this Agreement under Owner's existing DRMS Permit, provided that CMR shall prepare and file any technical revisions to such permit necessary to undertake the Phase 1 Plan, and shall post any additional financial assurances required to implement such technical revisions.

## 7. TITLE CURE; AMENDMENT AND RELOCATION.

a) Owner shall make available such abstracts of title and other title records pertaining to the Property which Owner may have to aid CMR in any title searching it may wish to undertake. CMR may, but shall have no obligation to, investigate and cure as it sees fit any defects in title to the Property which Owner fails to remedy after notice by CMR. Owner shall cooperate fully with CMR in the curing of any such title defect. With respect to any expenses incurred by CMR in this effort or incurred by Owner and reimbursed by CMR, CMR may include such expenses in the amounts secured by the Lien.

b) CMR shall have the right, but shall not be required, to amend, relocate, abandon and then relocate, topfile, overstake, or stake fractional unpatented mining claims covering gaps between all or any of the Mining Claims and to convert any such unpatented mining claims to millsite claims if and when CMR has determined that the land included therein is nonmineral in character. All actions taken by CMR under this Section shall be taken by CMR at CMR's sole expense and on behalf and in the name of Owner. Mining or millsite claims staked, amended, relocated, or patented by CMR pursuant to the provisions of this Section shall be deemed part of the Mining Claims and shall be subject to this Agreement. CMR shall not be liable or responsible to Owner for any reduction in the record or possessory title of Owner to any of the Property which may result from any action taken by CMR under this Agreement, and no such action shall constitute or be deemed to be a breach of any of CMR's obligations to Owner hereunder, *provided* that such action is taken by CMR in the good faith belief that the same is necessary in order to confirm, protect or preserve the rights of Owner in the Property or CMR's rights hereunder.

8. INSPECTION. CMR's records of all mining operations on the Property shall be available for Owner's inspection upon reasonable advance notice and during normal business hours, but no more than once each quarter. Subject to CMR's safety requirements and instructions, representatives of Owner may enter the mine workings and structures on the Mining Claims at all reasonable times upon reasonable advance notice for inspection thereof, but each representative of Owner shall so enter at his/her own risk and shall indemnify and hold CMR harmless against and from any damage, loss or liability by reason of injury to Owner or his/her agents or representatives or damage to or destruction of any property of Owner or said agents or representatives while on the Mining Claims on or in said mine workings and structures.

9. CONFIDENTIALITY. Each Party agrees to hold in confidence this Agreement and all information related to the operations contemplated hereunder disclosed to it directly or indirectly by any other Party or any of its affiliates; *provided, however,* the obligations of confidentiality shall not apply to information that at the time of disclosure is generally available to the public; information that after disclosure is published or otherwise becomes generally available to the public through no fault of the recipient (but only after, and only to the extent that, it is published or otherwise becomes generally available to the public); information that the recipient can show already was in the possession of the recipient or its affiliates at the time of disclosure (except in anticipation of this Agreement) and that without breach of any obligation of confidence such recipient is free to disclose to others; information deemed by CMR to be reasonably necessary for the preparation of studies necessary to determine the commercial feasibility and/or viability of the Mining Claims; or information that the recipient reasonably believes is required to be disclosed by applicable law or stock exchange rules.

10. TAXES. CMR shall pay all taxes assessed against any personal property which it may place on the Property and shall pay any real property taxes attributable to the period of time the Option is in effect. CMR has paid the 2011 taxes to protect the Property and agrees to pay the 2012 taxes payable in 2013. All such amounts shall be included in the Lien. Owner shall provide promptly to CMR copies of all documents it receives relating to such taxes. CMR may take such action, at its expense, as it deems proper to obtain a reduction or refund of taxes paid or payable by it, and Owner shall cooperate in such action, including but not limited to allowing such action to be taken and prosecuted in Owner's name.

11. LIENS.

a) CMR shall keep the Property free of all liens for labor or materials furnished to it in its operations hereunder and shall indemnify and save harmless Owner against and from any damage, loss or liability by reason of injury to person or damage to property as the result of its operations hereunder, except as provided in *Section 8* above. CMR may, but shall have no obligation to, contest the validity of any lien of the Property at its expense, and Owner shall cooperate in such contest, including but not limited to allowing such contest to be taken and prosecuted in Owner's name, and any such lien shall not be deemed a default unless finally adjudicated to be valid and not discharged by CMR.

b) Owner shall not cause or allow any liens, encumbrances or adverse claims to accrue against the Property. In the event any lien or encumbrance shall hereafter accrue against the Property by act or neglect of Owner, then CMR may, at CMR's option, pay and discharge the same. With respect to any amounts paid by CMR pursuant to the preceding sentence, such amount shall be included in the amounts secured by the Lien.

12. TERMINATION.

a) CMR shall have the right at any time to terminate this Agreement upon thirty (30) days written notice to Owner. CMR may release from this Agreement, from time to time, portions of the Mining Claims only with written permission of the Owner (hereinafter a "Partial Release"). With respect to any unpatented mining claims or other properties located by CMR or leased or otherwise acquired from third parties and included in the Property, CMR may propose abandonment of claims, termination of lease rights or sale or other disposition of the same at any time. If Owner objects to such abandonment, termination or disposition, Owner shall be entitled to require an assignment or conveyance of all of CMR's rights in such properties to Owner, provided that Owner expressly agrees in writing to assume all obligations and liabilities

-7-

in connection with such properties or interests, except as provided in Section 12.d) below. An approved Partial Release of any of the Mining Claims listed in *Exhibit A* shall reduce the AR payable during the Subsequent Term as a function of the number of claims so released. In the event of a Partial Release or relinquishment of any Property pursuant to this Section 12.a), each party agrees to grant to the other such easements across their respective properties as the other may need for access to properties in which it holds or continues to hold an interest for purposes of exploration, development, mining and reclamation of such properties.

b) This Agreement shall terminate upon exercise and fulfillment of all conditions precedent to the option set forth in Section 17 and the transfer of title to an undivided 60% interest in the Mining Claims pursuant thereto

c) Notwithstanding anything to the contrary herein, in the event CMR does not exercise its option set forth in Section 17, either Party may terminate this Agreement on fifteen (15) days prior written notice to the other Party. Any termination of this Agreement pursuant to this Section 12.c) shall also terminate the Irrevocable License concerning use of Water, and the provisions of Section 12.8 of the JV Agreement described in Section 17 shall apply as to Owner's resumption of control and operation of the Property.

d) Upon termination of this Agreement, or a Partial Release, as the case may be, all payments theretofore made to Owner shall be retained by Owner and all liabilities and obligations of CMR to Owner not then due or accrued shall cease and terminate, except any liabilities or obligations arising prior to termination or which survive termination. The Lien and any liability of CMR for all environmental conditions resulting directly from CMR's operations on the Property shall survive any termination or Partial Release.

13. DEFAULT. If CMR defaults in any of its obligations hereunder, Owner may give CMR written notice thereof specifying the default(s). If the default involves only an obligation to pay monies, CMR shall have fifteen (15) days from receipt of such notice to cure the default. In any other circumstance, CMR shall have sixty (60) days from receipt of such notice to cure the default unless it is of a nature that sixty (60) days is insufficient time in which to cure. In this event, CMR shall commence efforts to cure such default within the sixty (60) days, and shall continue such efforts until the default is cured. If CMR in good faith disputes that a default has occurred, then CMR shall so advise Owner in writing giving all available reasons to support the position. Thereafter, if the Parties continue to dispute the existence of a default, the matter may be resolved or determined by litigation in a court of competent jurisdiction, and the Parties shall have at their respective disposals all legal and equitable remedies allowed by applicable law, *provided* that no termination shall occur until sixty (60) days after judgment of default and failure to cure.

14. FORCE MAJEURE. Except for the obligation to make payments when due hereunder, the obligations of CMR shall be suspended to the extent and for the period that performance is prevented by any cause, whether foreseeable or unforeseeable, beyond its reasonable control, including, without limitation, labor disputes (however arising and whether or not employee demands are reasonable or within the power of CMR to grant); acts of God; federal, state and local laws (statutory or common), rules, ordinances, regulations, grants, concessions, franchises, licenses, orders, directives, judgments, orders, decrees, and other governmental restrictions, including permits and other similar requirements, whether legislative, municipal, administrative or judicial in nature; instructions or requests of any government or governmental entity; inability to obtain on reasonably acceptable terms any public or private license, permit or other authorization; curtailment or suspension of activities to remedy or avoid an actual or

-8-

alleged, present or prospective violation of Environmental Laws (as defined in the JV Agreement); action or inaction by any federal, state or local agency that delays or prevents the issuance or granting of any approval or authorization required to conduct Operations (as defined in the JV Agreement) beyond the reasonable expectations of the Party seeking the approval or authorization; acts of war or conditions arising out of or attributable to war, whether declared or undeclared; riot, civil strife, insurrection or rebellion; fire, explosion, earthquake, storm, flood, sink holes, drought or other adverse weather condition; delay or failure by suppliers or transporters of materials, parts, supplies, services or equipment or by contractors' or subcontractors' shortage of, or inability to obtain, labor, transportation, materials, machinery, equipment, supplies, utilities or services; accidents; breakdown of equipment, machinery or facilities; actions by native rights groups, environmental groups, or other similar special interest groups; inability to gain access or permits for access to the Property; inability to obtain qualified drillers and other workers or equipment for Operations; decline in metal prices to levels materially below recent historic values that prevent on a temporary basis removal of ore at Operating Expenses (as defined in the JV Agreement) less than such current prices; or any other cause whether similar or dissimilar to the foregoing. CMR shall promptly give notice to Owner of the suspension of performance, stating therein the nature of the suspension, the reasons therefor, and the expected duration thereof. CMR shall resume performance as soon as reasonably possible.

15. PERSONAL PROPERTY. In case of termination of this Agreement under the terms hereof or for any cause other than the exercise of the option described in Section 17, CMR shall have no liability or obligation hereunder except for those, including reclamation obligations, already accrued at such date of termination. Upon such termination, CMR shall surrender the Mining Claims to Owner and shall deliver to it a written instrument in further evidence of such termination, in appropriate form for recording. CMR shall have the right but not the obligation, to remove from the Property all property belonging to it (collectively, "Personal Property") but not machinery and equipment or other materials installed as part of CMR's obligation under the Phase 1 Plan, except that, if and to the extent the cost of acquisition of any Personal Property has been charged as an amount subject to the Lien, title to such Personal Property shall revert to Owner. If CMR desires to abandon any Personal Property that is not subject to the Lien, CMR shall give Owner notice that Owner may elect to allow such Personal Property to remain, and Owner may then take possession and ownership of such Personal Property.

16. RIGHT OF FIRST REFUSAL.

a) During the term of this Agreement, Owner agrees that if Owner should receive a bona fide offer acceptable to it from a third party to purchase all or any part of the Property, the Mining Claims and/or interest in this Agreement ("Option Property"), Owner shall give immediate written notice to CMR, setting forth the price and terms (inclusive of financing) and including a copy of the bona fide offer from such third party ("Option Notice"). In such event, CMR may, within thirty (30) days following receipt of the Option Notice, elect by written notice given to Owner to purchase the entire interest sought by the third party in the Option Property on the terms and conditions specified in the Option Notice, as supplemented with customary representations and warranties from Owner and the provisions hereof. In the event CMR fails to elect to purchase in said manner and within said period of time, Owner shall then and thereafter be free to sell the Option Property specified in the Option Notice to the third party making the offer in accordance with the terms and conditions specified in the Option Notice, subject to the Lien and the terms and conditions set forth herein, including, but not limited to, *Section* 17 below; *provided, however,* that if for any reason closing of the third party transaction for such Option Property is not completed within ninety (90) days after CMR receives the Option Notice, this right of first

-9-

refusal shall be revived in favor of CMR and notice of any subsequent bona fide offers acceptable to Owner shall be given to CMR upon the same terms and conditions for acceptance and rejection as hereinabove provided.

b) In accordance with the provisions of this Section, Owner shall grant, transfer, assign, and convey to CMR all of Owner's right, title and interest in the portion of the Mining Claims purchased, as well as all appurtenances, tenements, rights, easements, licenses, rights and privileges belonging thereto or benefitting that property, by executing and delivering to CMR a special warranty deed in a form reasonably acceptable to CMR, together with any other documents, deeds, instruments or declarations required to fully vest title to same in CMR, within two (2) business days after CMR tenders the purchase price set forth in the Option Notice (reduced by the amount of the Lien), or places the same in escrow. All general real estate taxes, special assessments and general assessments levied against such property shall be apportioned as of such date according to the calendar year, using the last available tax duplicate for rate and valuation, and CMR shall pay any recording fees, transfer taxes and legal fees in connection with the deed preparation. In further consideration of monies paid by CMR: (i) Owner will cooperate fully in obtaining such assurances or other accommodations from third parties to confirm the validity of the title conveyed to CMR; and (ii) to the extent reasonably required by CMR to develop the Mining Claims, Owner shall grant easements and right of way to CMR over adjacent property of Owner to facilitate such development in a form reasonably acceptable to CMR. The rights accruing to CMR under this Section may be assigned without the consent of the Owner.

c) The Parties agree that during the term of this Agreement, they shall not do any act or thing which would defeat, prejudice or diminish the rights of the other party under this Section; *provided, however,* that nothing herein shall limit CMR's option to deliver to Owner, or the effectiveness of, a JV Notice (*as defined below*).

## 17. JOINT VENTURE OPTION

a) Owner grants CMR the irrevocable option to purchase a sixty percent (60%) undivided interest in the Mining Claims for a total aggregate purchase price equal to SIX MILLION, FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($6,500,000.00) ("JV Price"). CMR may exercise this option at any time on or prior to March 19, 2013 by giving Owner notice in writing of its election to do so ("JV Notice"). On or before the thirtieth (30th) day following delivery of the JV Notice: (i) CMR shall deliver to an escrow agent selected by CMR and acceptable to Owner ("Escrow Agent") the JV Price and an executed copy of the JV Agreement; and (ii) Owner shall deliver to Escrow Agent an executed copy of the JV Agreement and a duly executed and notarized Special Warranty Deed (in a form reasonably satisfactory to CMR).

b) Upon full delivery by each party, Escrow Agent shall release the JV Price, less the amount necessary to release any liens made or suffered by Owner prior to the Effective Date or without the permission of CMR, to Owner and the Special Warranty Deed to CMR, this Agreement shall terminate, and the Property shall thereafter be developed and operated in accordance with the JV Agreement.

c) The option described in this Section shall terminate if not exercised on or prior to March 19, 2013. In furtherance of the foregoing: (i) the right to exercise such option shall not be limited by the delivery of any Option Notice pursuant to Section 16; and (ii) the Parties agree that, during the term of this Agreement, they shall not do any act or thing which would defeat, prejudice or diminish the rights of the other Party under this Section.

-10-

18. NOTICES. All notices hereunder shall be in writing and may be delivered by certified mail, or by personal delivery, and such mailing thereof, or personal delivery, shall be deemed the act of giving of notice. Such notices shall be addressed to Owner as follows:

CAMP BIRD COLORADO, INC.
15811 Fisher Island Drive
Miami, Florida 33109
Attn: Bentley J. Blum
Tel: 305-534-8023
Fax: 305-534-8122
Email: bjbmail@aol.com

And to CMR, as follows:

CALDERA MINERAL RESOURCES, LLC
c/o Monadnock Mineral Services
P.O. Box 85
Ouray, CO 81427
Attn.: Bob Larson
Tel: 970-325-4600
Cell: 970-318-1430
E-mail: larsouray@qwestoffice.net

With a copy to:

A. John A. Bryan Jr.
Chief Executive Officer
The Watley Group, LLC
8439 Sunset Boulevard, Suite 402
West Hollywood, CA 90069
Telephone: 310-777-8889
Email: jbryan@watley.com

and to

Abraham Advocates and Solicitors
19 Keppel Road #09-05
Jit Poh Building
Singapore 089058
Attn: Mohan R. Abraham
Tel: (65) 6513 2382
Fax: (65) 6323 0291
Email: mohan@abrahamlawoffice.com

Any demand or notice of default or termination to CMR from Owner shall be effective only if signed by all persons identified in this Agreement as being an Owner.

19. USAGE. All defined terms as used herein include the plural, and reference to one gender includes the other and the plural when appropriate.

20. MEMORANDUM FOR RECORDING. Owner and CMR shall execute a Memorandum of Mining Lease and Agreement covering the Property for purposes of recording substantially in the form of *Exhibit E* hereto. Owner shall not record this Agreement without CMR's prior written consent.

21. ASSIGNMENT. Subject to *Sections 16* and *17*, Owner may assign its rights under this Agreement, in whole or in part, and this Agreement shall be binding upon and inure to the benefit of the Parties hereto, their heirs, executors, administrators, successors and assigns. CMR may assign this Agreement in whole or in part at any time to any other party upon written notice to Owner.

22. COUNTERPARTS. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, taken together, shall constitute a single agreement.

23. U.S. DOLLARS. All dollar amounts are in US currency.

24. GOVERNING LAW. This Agreement shall be governed by and interpreted in accordance with the laws of the State of Colorado.

25. ENTIRE AGREEMENT. This Agreement supersedes all prior written and verbal understandings and agreements of the Parties, including without limitation that certain Camp Bird Mine Memorandum of Understanding between Owner and Copper King Mining Corporation, now assigned to CMR, dated effective June 22, 2012. This Agreement sets forth the entire understanding between the Parties and may be modified or amended only in writing by an instrument signed by the Party to be charged with such modification or amendment. This Agreement shall not be construed to contain any implied consideration, warranties, representations, or covenants, including any implied obligation of CMR to explore, mine or otherwise work the Mining Claims or extract Minerals, beyond the specific undertakings set forth herein and is not intended to create any partnership between the Parties.

26. FURTHER DOCUMENTATION. The Parties agree that they will execute such further agreements, conveyances and assurances as the Parties may deem necessary to carry out this Agreement.

27. SEVERABILITY. If any part of this Agreement is found invalid for any reason by a court of competent jurisdiction, that part shall be deemed severed from this Agreement only to the extent necessary to remedy such invalidity and will not affect the validity of the remaining parts of this Agreement.

**IN WITNESS WHEREOF**, the Parties have executed this Mining Lease and Option Agreement as of the Effective Date above written.

| Caldera Mineral Resources, LLC | Camp Bird Colorado, Inc. |
|---|---|
| By: | By: _____ |
| Name: | Name: _____ |
| Title: C E O | Title: _____ |

STATE OF _____ )
                           ) SS.
COUNTY OF _____ )

On this _____ day of September, 2012, _____ personally appeared before me, a Notary Public, who acknowledged that he/she executed the foregoing instrument as _____ of Caldera Mineral Resources, LLC, a Delaware limited liability company.

_____
Notary Public

STATE OF _____ )
                           ) SS.
COUNTY OF _____ )

On this _____ day of September, 2012, _____ personally appeared before me, a Notary Public, who acknowledged that he/she executed the foregoing instrument as _____ of Camp Bird Colorado, Inc., a Colorado corporation.

_____
Notary Public

-13-

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of LOS ANGELES

On 09.22.12 before me, JASON MIRZA NOTARY PUBLIC
　　　Date　　　　　　　　　　　　Here Insert Name and Title of the Officer

personally appeared ANTHONY JOHN ADRIAN BRYAN JR.
　　　　　　　　　　　　　　　　　Name(s) of Signer(s)

JASON MIRZA
Commission # 1973615
Notary Public - California
Los Angeles County
My Comm. Expires Mar 30, 2016

who proved to me on the basis of satisfactory evidence to
be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the
instrument the person(s) or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws
of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

Signature_____
　　　　　　　　　Signature of Notary Public

Place Notary Seal Above

---

**OPTIONAL**

*Though the information below is not required by law, it may prove valuable to persons relying on the document
and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: MINING LEASE AND OPTION TO PURCHASE

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

| | |
|---|---|
| Signer's Name: _____ | Signer's Name: _____ |
| ☐ Individual | ☐ Individual |
| ☐ Corporate Officer — Title(s): _____ | ☐ Corporate Officer — Title(s): _____ |
| ☐ Partner — ☐ Limited ☐ General　**RIGHT THUMBPRINT OF SIGNER** Top of thumb here | ☐ Partner — ☐ Limited ☐ General　**RIGHT THUMBPRINT OF SIGNER** Top of thumb here |
| ☐ Attorney in Fact | ☐ Attorney in Fact |
| ☐ Trustee | ☐ Trustee |
| ☐ Guardian or Conservator | ☐ Guardian or Conservator |
| ☐ Other: _____ | ☐ Other: _____ |
| Signer Is Representing: _____ | Signer Is Representing: _____ |

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org Item #5907 Reorder: Call Toll-Free 1-800-876-6827

**IN WITNESS WHEREOF**, the Parties have executed this Mining Lease and Option Agreement as of the Effective Date above written.

| Caldera Mineral Resources, LLC | Camp Bird Colorado, Inc. |
|---|---|
| By: _____ | By: _Scott A Butters_ |
| Name: _____ | Name: _SCOTT A. BUTTERS_ |
| Title: _____ | Title: _PRESIDENT_ |

STATE OF _____ )
                                                    ) SS.
COUNTY OF _____ )

        On this _____ day of September, 2012, _____ personally appeared before me, a Notary Public, who acknowledged that he/she executed the foregoing instrument as _____ of Caldera Mineral Resources, LLC, a Delaware limited liability company.


_____
Notary Public

STATE OF ___UTAH_____ )
                                          ) SS.
COUNTY OF __Davis___ )

        On this 21st day of September, 2012, _Scott Buttles_ personally appeared before me, a Notary Public, who acknowledged that he/she executed the foregoing instrument as _PRESIDENT_ of Camp Bird Colorado, Inc., a Colorado corporation.

_____
Notary Public

N. DEV NIELSON
Notary Public
State of Utah
My Commission Expires Nov. 17, 2013
Commission #: 561010

-13-

## EXHIBIT A

### MINING CLAIMS

### Camp Bird Colorado, Inc. Mining Claims

| Treasurer Account # | Mineral Survey Number | Claim Name | Acres |
|---|---|---|---|
| N004550 | MS 20281 | AFRICA | 6.40 |
| N004550 | MS 721A | AGNES | 10.31 |
| N004550 | MS 20281 | AGNEW | 11.63 |
| N004550 | MS 16094 | AGUINALDE | 9.88 |
| N004550 | MS 15181 | ALDEN | 7.17 |
| N004550 | MS 11969 | APACHE | 6.29 |
| N004550 | MS 17489A | BABCOCK 1 | 9.94 |
| N004757 | MS 14776 | BALSAM | 9.39 |
| N004757 | MS 14772 | BARNABY | 9.40 |
| N004757 | MS 14773 | BASUTO | 3.43 |
| N004550 | MS 13406 | BIRDSEYE | 10.33 |
| N004550 | MS 16041 | BLACK QUAIL | 7.54 |
| N004550 | MS 17489A | BLEWSOME | 9.21 |
| N004550 | MS 17381 | BODEGA | 6.98 |
| N004550 | MS 17489A | BO SMITH 1 | 10.25 |
| N004550 | MS 17489A | BO SMITH 2 | 7.20 |
| N004550 | MS 14450 | BOXER | 6.97 |
| N004550 | MS 16094 | BRYANT | 10.27 |
| N004550 | MS 164 | BUCKEYE GIRL | 10.33 |
| N004550 | MS 13402 | CABANAS | 7.34 |
| N004550 | MS 11611 | CAMP BIRD | 7.03 |
| N004550 | MS 12165 | CANUCK | 10.33 |
| N004550 | MS 16096 | CHANNEL | 6.63 |
| N004550 | MS 1642 | CHICAGO | 10.33 |
| N004550 | MS 15370 | COMPASS | 1.98 |
| N004550 | MS 16155 | CONEY | 10.33 |
| N004757 | MS 723A | CONQUEROR | 9.50 |
| N004550 | MS 723B | CONQUEROR MS | 5.00 |
| N004550 | MS 14776 | CONSTANCE | 10.25 |
| N004550 | MS 15198 | CORONADO | 10.33 |
| N004550 | MS 14773 | COSMOS | 1.00 |
| N004550 | MS 13402 | COURIER | 3.79 |

| | | | |
|---|---|---|---|
| N004550 | MS 16242 | COUSIN JACK | 8.16 |
| N004550 | MS 575 | CRUSADER | 10.33 |
| N004550 | MS 16041 | DAISY | 9.36 |
| N004550 | MS 12877 | DAMON | 0.10 |
| N004550 | MS 12637A | DEADWOOD | 6.55 |
| N004757 | MS 12637B | DEADWOOD | 4.97 |
| N004550 | MS 722A | DECLARATION | 10.31 |
| N004757 | MS 722B | DECLARATION MS | 5.00 |
| N004550 | MS 17489A | DIPPER | 8.58 |
| N004550 | MS 12876 | DIVIDE | 0.16 |
| N004550 | MS 14450 | DODO | 9.98 |
| N004550 | MS 18203A | DOMINGO | 9.94 |
| N004550 | MS 18203A | DOMINGO 2 | 6.87 |
| N004550 | MS 17489A | DUTCHESS | 9.03 |
| N004550 | MS 547A | EMILY | 9.39 |
| N004757 | MS 547B | EMILY MS | 5.00 |
| N004550 | MS 17489A | ENSIGN | 10.17 |
| N004550 | MS 17489A | ENTOMOLOGIST | 9.53 |
| N004550 | MS 17489A | EQUATOR | 9.77 |
| N004550 | MS 17489A | EQUINOX | 8.97 |
| N004550 | MS 12949A | EVANGELINE | 6.98 |
| N004550 | MS 12949B | EVANGELINE MS | 0.79 |
| N004550 | MS 4852 | FIRST NATIONAL | 10.33 |
| N004550 | MS 17489A | FOX | 10.33 |
| N004550 | MS 1548A | GERTRUDE | 10.24 |
| N004757 | MS 1548B | GERTRUDE MS | 5.00 |
| N004757 | MS 535A | GLEN MONARCH | 10.33 |
| N004757 | MS 535B | GLEN MONARCH MS | 3.14 |
| N004550 | MS 17112 | GOLD NUGGET PLACER | 19.88 |
| N004550 | MS 18750 | GORE | 0.33 |
| N004550 | MS 14776 | HAGER | 8.96 |
| N004550 | MS 16096 | HALIFAX | 5.82 |
| N004550 | MS 2132 | HANCOCK | 9.58 |
| N004550 | MS 15195 | HECKLA | 10.33 |
| N004550 | MS 16094 | HELLESPONT | 8.52 |
| N004550 | MS 15195 | HESTER | 9.65 |
| N004550 | MS 16095 | HIGH LINE | 8.52 |
| N004550 | MS 15198 | HONOLULU | 2.52 |
| N004550 | MS 16094 | HUMMING BIRD | 10.27 |
| N004550 | MS 16041 | IDAHO | 9.57 |

| | | | |
|---|---|---|---|
| N004550 | MS 161 | IMOGENE | 10.20 |
| N004550 | MS 17489A | IRON MAN | 9.35 |
| N004550 | MS 12031 | IVANHOE | 10.05 |
| N004550 | MS 11969 | JICARILLA | 8.24 |
| N004550 | MS 14450 | JUNEAU | 8.92 |
| N004550 | MS 14450 | JUNEAU 2 | 9.10 |
| N004550 | MS 16095 | KEYSTONE | 0.98 |
| N004550 | MS 15473 | KING EDWARD | 8.28 |
| N004550 | MS 16095 | KOKOMO | 9.90 |
| N004550 | MS 14450 | KOOTENAI | 7.98 |
| N004550 | MS 8239A | LAUNAKA | 9.85 |
| N004550 | MS 8239B | LAUNAKA MS | 5.00 |
| N004550 | MS 16094 | MANILLA | 5.62 |
| N004550 | MS 14787 | MATANZAS | 0.55 |
| N004550 | MS 17489A | MEMORANDA | 10.19 |
| N004550 | MS 16041 | MIDNIGHT | 8.56 |
| N004550 | MS 16094 | MILES | 6.49 |
| N004550 | MS 17489A | MODOC | 8.71 |
| N004550 | MS 11969 | MOJAVE | 8.35 |
| N004550 | MS 15405 | MONTE CARLO | 9.38 |
| N004550 | MS 11969 | MOQUI | 7.46 |
| N004550 | MS 16236 | MORAINE | 10.33 |
| N004550 | MS 17318 | NOOTKA | 6.29 |
| N004550 | MS 17318B | NOOTKA MS | 4.90 |
| N004550 | MS 546A | NORMA | 10.33 |
| N004550 | MS 546B | NORMA MS | 5.00 |
| N004550 | MS 15473 | OLD IRELAND | 5.51 |
| N004550 | MS 13402 | OLYMPIA | 7.63 |
| N004550 | MS 16095 | OMEGA | 9.35 |
| N004550 | MS 20280 | ONLY ONE | 13.77 |
| N004550 | MS 11969 | ORO CACHE | 9.97 |
| N004550 | MS 16094 | OTIS | 9.80 |
| N004550 | MS 15370 | PALO ALTO | 9.13 |
| N004550 | MS 16041 | POLAR BEAR | 5.44 |
| N004550 | MS 15181 | PRISCILLA | 9.02 |
| N004550 | MS 12877 | PYTHIAS | 6.89 |
| N004550 | MS 13406 | RANCHERO | 6.36 |
| N004550 | MS 18750 | REBECCA | 3.30 |
| N004550 | MS 12748 | RIGEL | 2.50 |

| | | | |
|---|---|---|---|
| N004550 | MS 13406 | ROCK LAKE | 8.06 |
| N004757 | MS 14772 | RUDGE | 9.27 |
| N004550 | MS 15474 | SARACEN | 10.33 |
| N004550 | MS 13406 | SCORCHER | 10.33 |
| N004550 | MS 12875 | SCORIFIER | 2.33 |
| N004550 | MS 15405 | SEBASTOPOL | 10.29 |
| N004550 | MS 16095 | SKYSCRAPER | 0.10 |
| N004550 | MS 17489A | SNAPSHOT | 10.33 |
| N004550 | MS 16094 | SPENCER | 4.90 |
| N004550 | MS 15370 | ST. PAUL | 9.46 |
| N004550 | MS 15181 | STANDISH | 7.81 |
| N004757 | MS 17309 | SUN LIGHT PLACER | 39.57 |
| N004550 | MS 13992 | TAM O SHANTER | 10.04 |
| N004550 | MS 16041 | TIGER | 10.19 |
| N004550 | MS 16155 | TIPPERARY | 9.88 |
| N004550 | MS 14776 | TOM MOORE | 7.72 |
| N004550 | MS 15405 | TRAMP | 10.31 |
| N004550 | MS 17344 | TUSCARORA | 3.91 |
| N004550 | MS 11611 | TUSCOLA | 10.31 |
| N004550 | MS 738A | UNA | 10.38 |
| N004550 | MS 738B | UNA MS | 4.99 |
| N004550 | MS 17381A | US TREASURY | 10.33 |
| N004550 | MS 17381B | US TREASUR EXT | 10.33 |
| N004550 | MS 14776 | VERNE | 5.44 |
| N004757 | MS 6476B | VIRGINIUS MS | 4.85 |
| N004550 | MS 17489A | WHITE FLAG | 5.92 |
| N004550 | MS 16041 | WHITE QUAIL | 10.01 |
| N004550 | MS 16236 | WHITE SCUD | 10.33 |
| N004550 | MS 15405 | WHITE SWEDE | 10.28 |
| N004550 | MS 16041 | WYOMING | 9.24 |
| N004550 | MS 12031 | YALLER DORG | 10.33 |
| N004550 | MS 15473 | YELLOW BIRD | 8.16 |
| N004757 | MS 576A | YELLOW ROSE | 10.22 |
| N004550 | MS 576B | YELLOW ROSE | 5.00 |
| N004550 | MS 12876 | ZEPHYR | 6.60 |
| | Total Acres | | **1,186.25** |

## EXHIBIT B

### PHASE 1 PLAN

**Duration:**        Phase 1 (Due diligence plus 180 days)

**Objective:**       1. Accomplish Phase 1 Conditions
                     2. Prepare mine so continued exploration and evaluation can be done during winter
                     3. Evaluation and exploration of mine

Items to be Accomplished and Evaluated:

a. Verify mine claims

b. Make mine visit to examine mine access, road conditions, and general layout

c. Engage our full Phase 1 mining team of employees and consultants

d. Make preparations to file for MSHA permit and ID number
        (1) Contact and contract with Mine Rescue Team
        (2) Contact and contract with Safety Training Team
        (3) Task training plan
        (4) Ventilation plan
        (5) Emergency exit plan

e. File for exploration and evaluation permit
        (1) Notification to San Miguel County
        (2) Notification to State of Colorado
        (3) Environmental permits

f. Hire road contractor to grade and prepare road access to level 14 and level 3

g. Purchase mine access materials, mine safety materials, core drill, and drilling materials
        (1) Compressor
        (2) Generator and transformers
        (3) Rail cars to accommodate level 3 and 14 rails as described in the MOU
        (4) Piping and electrical line repairs
        (5) Repair or replace man lifts in rises, as described in the MOU
        (6) Core drill (termite drill and accessories)

h. Purchase and locate modular units for mine office, dry space, and utilities

i. Contract for 3D mine survey map

j. Hire mine contractor through bid and familiarity process (Williams Brothers or others)
        (1) Open and secure portals and adits to levels 1, 2, 3 and 14
        (2) Extend adits at levels 2 and 3
        (3) Install safety equipment
        (4) Open all needed access points including rises from 14 to 3 level
        (5) Repair or set rail where needed to move overburden
        (6) Prepare mine as much as possible for winter operations

k. Hire drilling contract crew to operate dill
        (1) Under supervision of geologist, drill core samples

l. Purchase sample preparation equipment

m. Contract with analytical laboratory for analysis of samples

## EXHIBIT C

## AREA OF INTEREST

The "Area of Interest" shall mean any parcels of lands or mineral interests that lie, in whole or in part, within five (5) miles from the boundary of any of the Mining Claims listed in Exhibit A. Such parcels or interests shall include (but are not limited to) all areas that have been, are being, or may be used for exploration, mining, extracting, producing, beneficiating, handling, milling or other processing of Minerals.

## EXHIBIT D

## JOINT VENTURE AGREEMENT

Exhibit B

CALDERA MINERAL RESOURCES, LLC
c/o Monadnock Mineral Services
P.O. Box 85
Ouray, CO 81427
September 20, 2012

CAMP BIRD COLORADO, INC.
15811 Fisher Island Drive
Miami, Florida 33109
Attn: Bentley J. Blum

Re: Supplemental agreement regarding tailings.

Gentlemen:

Caldera Mineral Resources ("Caldera") has entered into that certain Mining Lease with Option to
Purchase ("Option") of even date with Camp Bird Colorado, Inc. ("CBC") concerning exploration,
development and mining for Minerals (as defined in the Option) from the Camp Bird Mine property that
is the subject of the Option. Terms used in this letter and not otherwise defined have the meaning set
forth in the Option or in the Exhibit or other instrument referenced in the Option (collectively,
"Transaction Documents") in which any such term is defined. This letter sets forth certain supplemental
understandings of the parties in connection with the Option and the JV Agreement that is attached as an
Exhibit to the Option.

1.      Tailings. There are substantial tailings from historic mining and processing operations located
on the Mining Claims that are subject to the Option ("Tailings"). Notwithstanding any provision to the
contrary in the Transaction Documents, and whether considered part of the Property or as being merely
an Asset located on the Mining Claims, the following provisions apply:

        (a)     The Tailings will not be considered Minerals, Subject Minerals or Products under any of
the Transaction Documents.

        (b)     Caldera can remove all or any part of the Tailings and, if it desires, process them and sell
them or minerals extracted from them without any payment to CBC.

        (c)     If removed or processed, those Tailings will be deemed solely owned by Caldera.

        (d)     Tailings removed or processed will not be considered part of the 50,000 tons of ore
contemplated to be extracted under the Phase 1 Plan in the Option or under Phase 2 in the JV
Agreement.

601590241.1

(e)     No Production Royalty under the Reservation of Perpetual Gross Royalty of even date ("Reserved Royalty") executed by CBC will be payable on tailings removed pursuant to subparagraph (b), above.

(f)     If there are revenues from the Tailings in excess of cost of removal of Tailings, the amount of such net revenue will be applied by Caldera and its parent, Caldera Holdings, LLC, to reduce the amount of the Lien evidenced by the Deed of Trust of even date recorded against the Property.

2.     Data. CBC will promptly supply all technical and other data regarding the San Miguel County properties that were conveyed in a treasurer's deed to third parties as well as any data concerning Ouray or San Miguel County properties within the Area of Interest now or previously owned by CBC.

3.     Liens. CBC represents and warrants that the total amount secured by any deeds of trust from CBC in favor of Dufford & Brown, P.C., do not exceed $185,000. CBC further represents and warrants that, notwithstanding the existence of a deed of trust in favor of the JJR Trust appearing of record, the indebtedness secured by that deed of trust has been paid in full. CBC covenants and agrees that it will cause CHH Operating Company to subordinate the lien of its deed of trust on the Mining Claims to the Deed of Trust in favor of Caldera Holdings, LLC, granted in connection with the Transaction Documents.

4.     Termination. This letter shall expire on September 20, 2015, or upon "termination" pursuant to paragraph 12 of the Option.

Kindly acknowledge CBC's agreement as to the foregoing matters by executing a counterpart of this letter as provided below and returning it to us.

Sincerely,

For Caldera Mineral Resources, LLC

Camp Bird hereby acknowledges and agrees to the foregoing terms and conditions.

CAMP BIRD COLORADO, INC.,

By: _____

_____
_____ (Title)

(e)     No Production Royalty under the Reservation of Perpetual Gross Royalty of even date ("Reserved Royalty") executed by CBC will be payable on tailings removed pursuant to subparagraph (b), above.

(f)     If there are revenues from the Tailings in excess of cost of removal of Tailings, the amount of such net revenue will be applied by Caldera and its parent, Caldera Holdings, LLC, to reduce the amount of the Lien evidenced by the Deed of Trust of even date recorded against the Property.

2.     Data. CBC will promptly supply all technical and other data regarding the San Miguel County properties that were conveyed in a treasurer's deed to third parties as well as any data concerning Ouray or San Miguel County properties within the Area of Interest now or previously owned by CBC.

3.     Liens. CBC represents and warrants that the total amount secured by any deeds of trust from CBC in favor of Dufford & Brown, P.C., do not exceed $185,000. CBC further represents and warrants that, notwithstanding the existence of a deed of trust in favor of the JJR Trust appearing of record, the indebtedness secured by that deed of trust has been paid in full. CBC covenants and agrees that it will cause CHH Operating Company to subordinate the lien of its deed of trust on the Mining Claims to the Deed of Trust in favor of Caldera Holdings, LLC, granted in connection with the Transaction Documents.

4.     Termination. This letter shall expire on September 20, 2015, or upon "termination" pursuant to paragraph 12 of the Option.

Kindly acknowledge CBC's agreement as to the foregoing matters by executing a counterpart of this letter as provided below and returning it to us.

Sincerely,

For Caldera Mineral Resources, LLC

Camp Bird hereby acknowledges and agrees to the foregoing terms and conditions.

CAMP BIRD COLORADO, INC.,

By: _____

_____ (Title)

601590241.1

(e)      No Production Royalty under the Reservation of Perpetual Gross Royalty of even date ("Reserved Royalty") executed by CBC will be payable on tailings removed pursuant to subparagraph (b), above.

(f)      If there are revenues from the Tailings in excess of cost of removal of Tailings, the amount of such net revenue will be applied by Caldera and its parent, Caldera Holdings, LLC, to reduce the amount of the Lien evidenced by the Deed of Trust of even date recorded against the Property.

2.      Data. CBC will promptly supply all technical and other data regarding the San Miguel County properties that were conveyed in a treasurer's deed to third parties as well as any data concerning Ouray or San Miguel County properties within the Area of Interest now or previously owned by CBC.

3.      Liens. CBC represents and warrants that the total amount secured by any deeds of trust from CBC in favor of Dufford & Brown, P.C., do not exceed $185,000. CBC further represents and warrants that, notwithstanding the existence of a deed of trust in favor of the JJR Trust appearing of record, the indebtedness secured by that deed of trust has been paid in full. CBC covenants and agrees that it will cause CHH Operating Company to subordinate the lien of its deed of trust on the Mining Claims to the Deed of Trust in favor of Caldera Holdings, LLC, granted in connection with the Transaction Documents.

4.      Termination. This letter shall expire on September 20, 2015, or upon "termination" pursuant to paragraph 12 of the Option.

Kindly acknowledge CBC's agreement as to the foregoing matters by executing a counterpart of this letter as provided below and returning it to us.

Sincerely,

_____

For Caldera Mineral Resources, LLC

Camp Bird hereby acknowledges and agrees to the foregoing terms and conditions.

CAMP BIRD COLORADO, INC.,

By: _Scott A Butters_
    _Scott A. BUTTERS_
    _PRESIDENT_____ (Title)

Exhibit C

CALDERA MINERAL RESOURCES, LLC
c/o Monadnock Mineral Services
P.O. Box 85
Ouray, CO 81427

March 19, 2013

Via Certified Mail, Return Receipt Requested
Personal delivery via FedEx

Camp Bird Colorado, Inc.
15811 Fisher Island Drive
Miami, Florida 33109
Attn: Bentley J. Blum

Re: Notice of Exercise of Joint Venture Option

Dear Mr. Blum:

Pursuant to Section 17.a) of that certain Mining Lease and Option to Purchase dated as of the 20th day of September, 2012 ("Mining Lease"), by and between Caldera Mineral Resources, LLC ("CMR"), as lessee and optionee, and Camp Bird Colorado, Inc. ("CBCI") as Owner, CMR hereby gives CBCI notice that it elects to exercise its option to purchase a sixty percent undivided interest in the Mining Claims, as defined in the Mining Lease. (All capitalized terms used herein shall have the meaning ascribed to them in the Mining Lease unless otherwise defined.)

As soon as possible, and in any event within 30 days following delivery of this notice, CMR will designate an Escrow Agent, deliver to the Escrow Agent the JV Price and a counterpart of the JV Agreement executed by CMR, thereby putting CMR in a position to close the transaction upon CBCI's compliance with all requirements and conditions required of Owner under the Mining Lease.

We will shortly advise you of the Escrow Agent CMR has selected and the form of Special Warranty Deed that will be satisfactory to CMR in connection with the closing. We will also supply a form of the JV Agreement suitable for execution by CBCI, all as contemplated by Section 17.a) and 17.b) of the Mining Lease.

Also, in view of the Prejudgment Writ of Sequestration, obtained by the United States of America in *United States of America v. Federal Resources Corp.*, Case no 2:11-cv-00127-BLW, United States District Court for the District of Idaho, you are notified that CMR is delivering a copy of this notice to the Court and the counsel of record for the United States in such case and intends to advise those parties of any release or proposed release of funds due CBCI in connection with the exercise of the option described above. This notice is authorized under Section 9 of the Mining Lease because it is information that CMR believes is required to be disclosed by applicable law.

Sincerely,

A. John A. Bryan Jr.
for Caldera Mineral Resources, LLC

cc:  The Watley Group, LLC
     8439 Sunset Boulevard, Suite 402
     West Hollywood, CA 90069

Abraham Advocates and Solicitors
19 Keppel Road #09-05
Jit Poh Building
Singapore 089058
Attn:  Mohan R. Abraham
Fax: (65) 6323 0291
Email: mohan@abrahamlawoffice.com

## CERTIFICATE OF SERVICE

**Electronic Service (CM/ECF)** – I hereby certify that on the 30th day of December, 2015, I electronically filed the foregoing document with the United States Bankruptcy Court for the District of Utah by using the Court's CM/ECF system. I further certify that the parties of record in this case, as identified below, are listed as registered CM/ECF users and will be served through the CM/ECF system:

- **Andrew V. Hardenbrook    ahardenbrook@swlaw.com, jpollard@swlaw.com;docket_slc@swlaw.com**
- **Kristopher C. Kleiner    kris.kleiner@nortonrosefulbright.com, cecil.kennedy@nortonrosefulbright.com**
- **David E. Leta    dleta@swlaw.com, wkalawaia@swlaw.com;csmart@swlaw.com**


_____*/s/ Stephanie Reichert*_____
Stephanie Reichert